## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Luke Troxel and Philip Kampa, individually and on behalf of all others similarly situated, | Case No. 23-CV-02521 (JWB/DJF) |
| Plaintiffs, | |
| v. | **DEFENDANT UMR, INC.'s MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| UMR, Inc., | |
| Defendant. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 3

I.   Coverage for PrEP Services Under the ACA Varies Based on the
     Individual Circumstances of Each Plan Participant ...................................... 3

II.  Payers Process Claims Based on the Providers' Coding ............................. 5

III. UMR Develops Guidelines to Ensure Providers Know How to Code
     for PrEP ................................................................................................... 5

IV.  Processing PrEP Services Claims Can Involve Individualized
     Inquiries .................................................................................................. 7

V.   Troxel and Kampa Sought Coverage for PrEP-related Services, but
     Their Individual Experiences Differed From Those of Their
     Proposed Class ........................................................................................ 8

     A.   Luke Troxel ..................................................................................... 8

     B.   Philip Kampa ................................................................................ 10

VI.  Plaintiffs Filed This Lawsuit To Recover Costs They Allegedly Paid
     for PrEP-Related Services ........................................................................ 11

VII. Plaintiffs Seek Certification of Two Nationwide Classes of
     Participants in UMR-Administered Plans .................................................... 12

LEGAL STANDARD .................................................................................... 15

ARGUMENT ................................................................................................. 17

I.   Plaintiffs' Proposed Classes Are Not Ascertainable ................................... 17

     A.   Plaintiffs' Class Definitions and Ascertainability Analysis
          Relies on Unqualified and Unreliable Expert Opinion .................... 18

     B.   Plaintiffs Do Not Rehabilitate Their Expert's Unreliable
          Opinions With Other Evidence of an Ascertainable Class ............. 20

          1.   Plaintiffs' "objective criteria" are ill-defined and
               subjective .............................................................................. 20

2.    Plaintiffs rely on a set of overbroad and legally irrelevant codes ...................................................... 25

3.    Plaintiffs cannot rely on self-identification in a subsequent claims process to avoid their burden to demonstrate ascertainability .................................... 27

II.    Plaintiffs Cannot Satisfy the Rule 23(a) Factors ......................................... 27

A.    Plaintiffs Fail to Establish Numerosity ............................................. 28

B.    Plaintiffs Cannot Demonstrate Commonality ................................. 29

1.    Plaintiffs cannot establish liability of UMR for cost-sharing in violation of the ACA using evidence common to the class ................................................ 30

2.    Plaintiffs cannot establish that UMR breached any fiduciary duties to the class using evidence common to the class ................................................................ 32

C.    Plaintiffs' Claims Are Not Typical of the Classes They Seek to Represent .................................................................. 36

III.    Plaintiffs' Proposed Classes Do Not Meet the Rule 23(b) Requirements ................................................................ 39

A.    Neither class can be certified under Rule 23(b)(1)(A) ................... 39

B.    Neither class can be certified under Rule 23(b)(2) ........................ 41

C.    The Benefits Class cannot be alternatively certified under Rule 23(b)(3). .................................................................. 43

1.    Common questions do not "predominate" ........................... 43

2.    A class action is not "superior" .......................................... 44

3.    Damages are not measurable on a classwide basis .............. 45

CONCLUSION .................................................................. 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .................................................................*passim*

*Alan Presswood, DC., P.C. v. Doe*,
  2021 U.S. Dist. LEXIS 156870 (E.D. Mo. Aug. 19, 2021) ........................................ 27

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013) .................................................................. 17

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997) ............................................................. 16, 43

*Amy G. v. United Healthcare*,
  2020 U.S. Dist. LEXIS 101752 (D. Utah June 9, 2020) ........................... 30, 41, 43, 44

*Avritt v. Reliastar Life Ins. Co.*,
  2009 U.S. Dist. LEXIS 14000 (D. Minn. Feb. 23, 2009) ........................................ 36

*Avritt v. Reliastar Life Ins. Co.*,
  615 F.3d 1023 (8th Cir. 2010) .............................................. 16, 17

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) ................................................. 44

*Bouaphakeo v. Tyson Foods, Inc.*,
  564 F. Supp. 2d 870 (N.D. Iowa 2008) ............................................ 39, 40

*Boyle v. Int'l Bhd. of Teamsters Local 863 Welfare Fund*,
  579 F. App'x 72 (3d Cir. 2014) .................................................. 42

*Braidwood Mgmt. v. EEOC*,
  70 F.4th 914 (5th Cir. 2023) ................................................. 18

*Brecher v. Republic of Arg.*,
  806 F.3d 22 (2d Cir. 2015) ...................................................... 24

*Briscoe v. Health Care Serv. Corp.*,
  337 F.R.D. 158 (N.D. Ill. 2020) .............................................*passim*

*Brown v. Kerkhoff,*
    279 F.R.D. 479 (S.D. Iowa 2012) ................................................................. 21

*Brown v. Wells Fargo & Co.,*
    284 F.R.D. 432 (D. Minn. 2012) ............................................................. 16, 18

*Casa Orlando Apartments, Ltd. v. Fannie Mae,*
    624 F.3d 185 (5th Cir. 2010) ................................................................. 39, 40

*Dana Ltd. v. Aon Consulting, Inc.,*
    984 F. Supp. 2d 755 (N.D. Ohio 2013) ......................................................... 34

*Daniel F. v. Blue Shield of Cal.,*
    305 F.R.D. 115 (N.D. Cal. 2014) ..................................................... 18, 24, 27

*Dennis F. v. Aetna Life Ins.,*
    2013 U.S. Dist. LEXIS 137849 (N.D. Cal. Sept. 25, 2013) ........................ 36

*Doe v. BCBS of Md., Inc.,*
    173 F. Supp. 2d 398 (D. Md. 2001) .............................................................. 45

*In re EpiPen ERISA Litig.,*
    2020 U.S. Dist. LEXIS 139066 (D. Minn. Aug. 5, 2020) ........................... 34

*EQT Prod. Co. v. Adair,*
    764 F.3d 347 (4th Cir. 2014) ........................................................................ 18

*Fox-Quamme v. Health Net Health Plan of Or., Inc.,*
    2017 U.S. Dist. LEXIS 35964 (D. Or. Mar. 9, 2017) ............................ 22, 32

*Franco v. Conn. Gen. Life Ins. Co.,*
    299 F.R.D. 417 (D.N.J. 2014) ...................................................................... 43

*Graddy v. BlueCross BlueShield of Tenn., Inc.,*
    2010 U.S. Dist. LEXIS 14896 (E.D. Tenn. Feb. 19, 2010) ......................... 36

*Gries v. Standard Ready Mix Concrete, L.L.C.,*
    252 F.R.D. 479 (N.D. Iowa 2008) ............................................................... 29

*Hicks v. Sw. Energy Co.,*
    330 F.R.D. 183 (E.D. Ark. 2018) ................................................................. 24

*Hoekman v. Educ. Minn.,*
    335 F.R.D. 219 (D. Minn. 2020) ............................................................ 24, 27

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
   818 F.3d 775 (8th Cir. 2016) ................................................................. 17

*Ihrke v. N. States Power Co.*,
   459 F.2d 566 (8th Cir.), *vacated due to mootness*, 409 U.S. 815 (1972) ................... 17

*Jamie S. v. Milwaukee Pub. Sch.*,
   668 F.3d 481 (7th Cir. 2012) ................................................................. 41

*Johnston v. Paul Revere Life Ins. Co.*,
   241 F.3d 623 (8th Cir. 2001) ................................................................. 24

*Kulinski v. Medtronic Bio-Medicus*,
   21 F.3d 254 (8th Cir. 1994) ................................................................. 24

*La Mar v. H & B Novelty & Loan Co.*,
   489 F.2d 461 (9th Cir. 1973) ................................................................. 37

*Lipstein v. UnitedHealth Grp.*,
   296 F.R.D. 279 (D.N.J. 2013) ........................................................... 35, 43

*Martinez v. Brown*,
   2011 U.S. Dist. LEXIS 31247 (S.D. Cal. Mar. 24, 2011) ........................................... 42

*Mass. Laborers' Health & Welfare Fund v. BCBS of Mass.*,
   66 F.4th 307 (1st Cir. 2023) ................................................................. 34

*McCaffree Fin. Corp. v. Principal Life Ins. Co.*,
   811 F.3d 998 (8th Cir. 2016) ................................................................. 33

*McKeage v. Bass Pro Outdoor World*,
   2013 U.S. Dist. LEXIS 205651 (W.D. Mo. July 2, 2013), *aff'd* 847 F.3d
   992 (8th Cir. 2017) ................................................................. 25

*McKeage v. TMBC, LLC*,
   847 F.3d 992 (8th Cir. 2017) ........................................................... 17, 25

*In Re: Milk Prods. Antitrust Litig.*,
   195 F.3d 430 (8th Cir. 1999) ................................................................. 37

*Miller v. RP On-Site, LLC*,
   2020 U.S. Dist. LEXIS 221990 (N.D. Cal. Nov. 25, 2020) ........................................... 28

*Neufeld v. CIGNA Health & Life Ins. Co.*,
   2023 U.S. Dist. LEXIS 115660 (D. Conn. July 6, 2023) ............................... 30, 35, 40

*Osorio v. Tile Shop, LLC*,
　　2016 U.S. Dist. LEXIS 180077 (N.D. Ill. Dec. 30, 2016) ........................................... 44

*Pegram v. Herdrich*,
　　530 U.S. 211 (2000) ..................................................................................................... 33

*Pete v. State Farm Mut. Auto. Ins. Co.*,
　　2022 U.S. Dist. LEXIS 237119 (E.D. Ark. Sept. 29, 2022) ........................................ 24

*Pipefitters Local 636 Ins. Fund v. BCBS*,
　　654 F.3d 618 (6th Cir. 2011) ...................................................................................... 44

*In re Principal U.S. Prop. Account ERISA Litig.*,
　　2013 U.S. Dist. LEXIS 185665 (S.D. Iowa Sept. 30, 2013) ....................................... 24

*RJ v. CIGNA Health & Life Ins. Co.*,
　　2024 U.S. Dist. LEXIS 46485 (N.D. Cal. Feb. 12, 2024) ........................ 30, 31, 32, 35

*Sandusky Wellness Ctr., Ltd. Liab. Co. v. Medtox Sci., Inc.*,
　　821 F.3d 992 (8th Cir. 2016) ................................................................................. 16, 18

*Schwartz v. Upper Deck Co.*,
　　183 F.R.D. 672 (S.D. Cal. 1999) ................................................................................. 28

*Smith v. Brown & Williamson Tobacco Corp.*,
　　174 F.R.D. 90 (W.D. Mo. 1997) .................................................................................. 40

*Speerly v. GM, LLC*,
　　143 F.4th 306 (6th Cir. 2025) ................................................................................ 15, 17

*St. Louis Heart Ctr v. Vein Ctrs. For Excellence, Inc.*,
　　2017 U.S. Dist. LEXIS 103142 (E.D. Mo. July 5, 2017) ........................................... 27

*Steimel v. Wernert*,
　　823 F.3d 902 (7th Cir. 2016) ...................................................................................... 21

*Su v. BCBSM, Inc.*,
　　2024 U.S. Dist. LEXIS 150274 (D. Minn. Aug. 22, 2024) ......................................... 34

*In re Target Corp. Customer Data Sec. Breach Litig.*,
　　847 F.3d 608 (8th Cir. 2017) ...................................................................................... 16

*Thorne v. U.S. Bancorp*,
　　2021 U.S. Dist. LEXIS 94575 (D. Minn. May 18, 2021) ........................................... 38

*In re UnitedHealth Grp. PBM Litig.*,
   2017 U.S. Dist. LEXIS 208328 (D. Minn. Dec. 19, 2017)...........................................34

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)...................................................................*passim*

*Walke v. Grp. Long Term Disability Ins.*,
   256 F.3d 835 (8th Cir. 2001) ...........................................................35

*Wit v. United Behavioral Health*,
   79 F.4th 1068 (9th Cir. 2023) ..........................................................32

*Wood v. N. Miss. Health Servs.*,
   2023 U.S. Dist. LEXIS 175323 (N.D. Miss. Sept. 29, 2023) .....................................28

**Statutes**

29 U.S.C. § 1003(b).................................................................23

29 U.S.C. § 1132(g)................................................................45

42 U.S.C. § 300gg-13(a)(1) ...........................................................4

42 U.S.C. § 18011 ...................................................................4

Affordable Care Act ............................................................*passim*

ERISA ........................................................................*passim*

ERISA § 502(a)(1)(B) ..............................................................11

ERISA § 502(a)(3) .................................................................11

**Other Authorities**

29 C.F.R. 2560.503-1(h)..............................................................8

45 C.F.R. § 147.130(a)(1)(i)...........................................................4

45 C.F.R. § 147.140 ................................................................23

Fed. R. Civ. P. 23...............................................................*passim*

Fed. R. Civ. P. 65(d) ...............................................................42

*NASTAD's Updated PrEP, PEP, and Other HIV Prevention Strategies:*
    *Billing and Coding Guide*, YOUTUBE,
    https://www.youtube.com/watch?v=HIW0w2hsrv8 ............................................ 13, 15

## INTRODUCTION

Plaintiffs Luke Troxel and Philip Kampa ("Plaintiffs") seek to certify two amorphous classes of participants in employer-sponsored health benefit plans administered by Defendant UMR, Inc. ("UMR"). Plaintiffs wrongly contend that UMR does not provide "first-dollar" coverage for HIV pre-exposure prophylaxis ("PrEP") services in violation of the Affordable Care Act ("ACA"), meaning that the services were covered but that UMR required its in-network provider to collect a copay from the participant and to apply a deductible for the service.

Contrary to Plaintiffs' contention, UMR *does* provide first-dollar coverage when network providers comply with contractually-mandated, published protocols for billing the UMR-administered plan for PrEP services. Yet Plaintiffs seek to certify a class based on UMR's alleged lack of first-dollar coverage for PrEP services where providers did *not* bill consistent with UMR's billing protocols, but which Plaintiffs assert UMR somehow should have recognized as PrEP services. But Plaintiffs' own experts concede that persons in the proposed class may not have received PrEP services. Plaintiffs cannot ascertain whether anyone actually received PrEP services without individually reviewing medical records for each proposed class member.

Plaintiffs' inability to ascertain membership in the proposed class without individual review of medical records dooms class certification. Because the Court also cannot practicably conduct such individual review of the medical records for the tens of thousands of persons Plaintiffs assert are members of the proposed class, Plaintiffs cannot meet their burden to establish ascertainability, much less the requirements of numerosity,

1

commonality, or typicality under Rule 23 of the Federal Rules of Civil Procedure. Nor can Plaintiffs show that this case qualifies as any of the Rule 23(b) class actions.

Accordingly, Plaintiffs' Motion for Class Certification (ECF Nos. 170-84) ("Plaintiffs' Motion") fails for at least four reasons. First, as discussed above, Plaintiffs' Motion does not identify an ascertainable class.

Second, Plaintiffs cannot demonstrate commonality. Plaintiffs theorize that each of the 78,017 persons their experts identify using claims data should have received first-dollar coverage for PrEP services. But Plaintiffs cannot demonstrate using evidence common to the proposed class that any of these individuals received PrEP services, much less that any individual falls within the ACA mandate for first-dollar coverage. Plaintiffs similarly cannot establish with common proof that UMR owed fiduciary duties to the tens of thousands of proposed class members or their health care benefit plans.

Third, Plaintiffs fail to establish numerosity and typicality. Plaintiffs' experts conceded that their proposed class includes persons *who never received PrEP services* and could not quantify—or even estimate—how many received PrEP services, or how many fall within the USPSTF mandate for first-dollar coverage. Plaintiffs similarly cannot establish that their individual experiences typify the experiences of the proposed class due to the idiosyncratic coding practices of Plaintiffs' providers, Plaintiffs' failure to exhaust their administrative remedies, and UMR's defenses unique to each Plaintiff. These issues unique to Plaintiffs would necessarily be the focus for the factfinder at any trial of Plaintiffs' claims, and resolution of Plaintiffs' claims would resolve nothing about the claims of the theorized, hypothetical class.

Finally, Plaintiffs do not satisfy any of the three prongs of Rule 23(b). Plaintiffs cannot satisfy Rule 23(b)(1) or (b)(2) because an injunction or declaration requiring compliance with the ACA and ERISA will not provide classwide relief. Instead, evaluating the past and future benefits Plaintiffs seek would require the Court to conduct individualized reviews of each plan participant and each claim to determine whether PrEP-related services were provided and whether the participant and service qualified for first-dollar coverage. Plaintiffs also fail to meet the requirements of Rule 23(b)(1) or (b)(2) because monetary damages—repayment for allegedly underpaid plan benefits—are not "incidental" despite Plaintiffs' attempt to label them as equitable. Plaintiffs' alternative request for Rule 23(b)(3) certification likewise fails because the individualized determinations that fatally undermine Rule 23(a) commonality also undermine the stricter predominance analysis, and because the series of mini-trials required to evaluate the claims and potential damages of any potential class member undermine any supposed superiority of classwide adjudication.

For these reasons, Plaintiffs' Motion should be denied.

## **BACKGROUND**

### I.    **Coverage for PrEP Services Under the ACA Varies Based on the Individual Circumstances of Each Plan Participant**

The ACA requires private health insurers to cover "preventive health services," and the U.S. Preventive Services Task Force ("USPSTF") issues "recommendations" that identify the preventive care private insurers must cover "first dollar" (i.e., without cost

sharing by way of any deductible or copay). 42 U.S.C. § 300gg-13(a)(1); 42 U.S.C. § 18011; 45 C.F.R. § 147.130(a)(1)(i).

On June 11, 2019, the USPSTF recommended that PrEP be covered first dollar for a specific subset of the population especially at risk of contracting HIV, such as "men who have sex with men, persons at risk via heterosexual contact, and persons who inject drugs." Declaration of Shannon Bjorklund ("Bjorklund Decl.") Ex.1 at 3.[1] In a 2023 update, the USPSTF recommended coverage for individuals at "increased risk" and identified the same risk factors. *See* Ex.2 at 3. Under both recommendations, physicians must assess whether each patient fits within the limited group for which the USPSTF recommends first-dollar PrEP coverage. Ex.1 at 5; Ex.2 at 4-5; Ex.14 ("Killelea Dep.") 181:13-182:21.

A patient must receive certain services before a PrEP prescription, including HIV and STI testing, pregnancy testing, kidney function testing and office visits with counseling. When a network provider delivers services in connection with PrEP, the health plan must pay first-dollar if the plan participant is at risk for contracting HIV. Ex.3 ("ACA FAQ 47"). Providers may provide all these services for reasons unrelated to PrEP.  For example, providers may conduct kidney testing for an arthritis patient or an office visit for an ear infection. In such circumstances, the provider may collect the patient co-pays, coinsurance or deductibles. Ex.4 ("ACA FAQ 68") at 5; Declaration of Janice Jacobs ("Jacobs Decl.") ¶¶52-63.

---

[1] Unless noted, citations to "Ex.#" refer to exhibits in the Bjorklund Declaration.

## II.    Payers Process Claims Based on the Providers' Coding

Providers submit claims for health benefits using standardized numerical codes to communicate the diagnoses and services associated with a particular episode of treatment. Providers describe their services using "procedure codes" or "CPT Codes," published by the American Medical Association. *See* Ex.5. Providers describe a patient's medical conditions or diseases using "diagnosis codes" or "ICD-10 Codes," developed by the World Health Organization and the CDC. *See* Ex.6.

Providers submit claims for benefits using standardized claims forms. These forms allow payers to process claims on an automated basis without review of other documentation based on coding the providers record on the form. Payers use automated systems to process millions of claims every day using only the information communicated by the codes providers record on claim forms. Accordingly, "it is critical that appropriate medical service codes identify when items and services are furnished as preventive items or services[.]" ACA FAQ 68 at 4; Jacobs Decl. ¶70-71; Killelea Dep. 142:17-143:4.

## III.    UMR Develops Guidelines to Ensure Providers Know How to Code for PrEP

While the ACA requires that payers cover PrEP services first-dollar, neither the ACA nor the USPSTF identify specific procedure or diagnosis codes to designate services and treatments for PrEP. Instead, federal guidance recognizes that payers are "expect[ed]" to create "coding guidelines" to designate the codes they will recognize as designating PrEP services in order to "educate [] network providers and provide clear guidance on the [] proper usage of service codes [] to denote when an item or service" is preventive. ACA

FAQ 68 at 10. Federal guidance notes that providers are "encouraged" to "take steps to ensure that all recommended preventive items…are appropriately identified…." *Id.*

The United Preventive Care Guidelines (the "Guidelines"), which UMR uses, identify specific CPT and ICD-10 codes that providers should use to denote preventive services. Declaration of Dr. Nicolas Stettler-Davis ("Stettler-Davis Decl.") ¶¶7-12; Ex.7 at 1-2. United publishes the Guidelines on its website. Stettler-Davis Decl. ¶10. The Guidelines are regularly updated to account for revisions to CPT and ICD-10 codes and align with new ACA requirements. *Id.* ¶¶11-17.[2] Payer guidelines "are instrumental in the success of implementation of Grade A and B recommendations," according to the National Association of State and Territorial AIDS Directors ("NASTAD"). Ex.16 ("Elinoff Dep.") 100:15-16. NASTAD urges providers to review and adhere to payer policies to ensure proper payment. *Id.* 37:23-38:10, 39:1-5, 56:1-8, 59:16-20, 62:9-14, 68:16-19, 100:15-19. *see also* Ex.20 at 6-7, 41, 97. However, not all payers create or publish guidelines, leaving providers to play "billing bingo" and guess which code combinations may lead to coverage. Elinoff Dep. 32:22-33:1, 39:10-19, 100:4-11. This dilemma was particularly acute for PrEP services, because prior to October 2023, there was no ICD-10 code that was specific to PrEP. *Id.* 35:17-36:8, 46:1-19, 60:2-10, 62:9-14, 69:1-6.

---

[2] Contrary to Plaintiffs' motion, this process is not "██████████████████." *Contra* ECF 172 ("Plfs.Br.") at 2, 6. Nor is that out-out-context quotation about "UMR's approach to cost-sharing for PrEP." *Id.* at 2. Rather, that statement related to communicating revisions to plans, and reflected one individual's view concerning non-PrEP aspects of the Guidelines—"████████████████████████████." ECF 175 at 4.

United was one of the few payers that published detailed instructions for how to code PrEP services for first-dollar coverage. Ex.7; Ex.20 at 97. Indeed, less than three months before this lawsuit was filed, Plaintiffs' own expert emailed United to praise its guidelines: "We have reviewed UHC's payer guidance on PrEP and were really impressed with how detailed it is." Ex.21 at UMR_TROXEL_000015722.

United's Guidelines include a section for PrEP and identify specific diagnosis and procedure codes UMR will process as PrEP-related. Stettler-Davis Decl. ¶¶12-22; Ex.7 at 29-30; Ex.26 at UMR_TROXEL_000003387. For example, the Guidelines provide that an office visit for PrEP services will be paid first-dollar with the ICD-10 code "Z72.5" for "high risk sexual behavior" or "Z20.6" for "contact with and (suspected) exposure" to HIV," among other codes. Ex.7 at 29-30; Ex.26 at UMR_TROXEL_000003387. Neither of these ICD-10 codes is unique to PrEP, but UMR identified them in payer guidance to give providers a way to have PrEP claims paid first dollar. Stettler-Davis Decl. ¶¶18-20.

## IV.    Processing PrEP Services Claims Can Involve Individualized Inquiries

When network providers code PrEP claims consistent with the Guidelines, UMR generally pays them first dollar. *Id.* ¶22. By contrast, if a provider uses a code not in the Guidelines—for example, Troxel's provider using a generic diagnosis code for ██████████ ███████████████ (*infra* p.9)—UMR does not recognize or process the claim as PrEP because it could relate to any number of different, non-PrEP services. *Id.* ¶¶22-24. Patients and providers have avenues for relief if UMR does not cover PrEP claims first-dollar: The provider can resubmit the claims with corrected coding or appeal, or the patient

can appeal and submit additional information, such as medical records, demonstrating PrEP services. *Id.; see also* 29 C.F.R. 2560.503-1(h).

UMR will reverse any cost sharing when a participant shows that he qualifies for first-dollar PrEP coverage, even if the provider used incorrect coding. *Cf.* Exs. 27, 28 (Kampa's appeal denied because Kampa did *not* demonstrate he met criteria). While participants may submit medical records with an appeal, they do not submit records with the initial claim. Jacobs Decl. ¶¶64-66; 106-09.

## V.    Troxel and Kampa Sought Coverage for PrEP-related Services, but Their Individual Experiences Differed From Those of Their Proposed Class

### A.    Luke Troxel

Troxel was a participant[3] of the ERISA plan sponsored by his former employer, Abbott Laboratories. ECF 180 ¶4. Abbott contracted with separate entities to provide claims processing and appeals: UMR "for medical claims" and Quantum "for care coordination and medical claim appeals." Ex.24 at PLTFS_000197; PLTFS_000278. A member challenging UMR's initial claim determination must file first and second-level appeals with Quantum, which had "the final, discretionary authority to determine if a claim appeal is payable under the terms of the Plan." *Id.* at PLTFS_000278. *See generally id.* at PLTFS_000278-88; Ex.12 ("Troxel Dep.") 328:11-332:3.

---

[3] Plaintiffs use different terms to describe the participants and beneficiaries in health benefit plans administered by UMR, including "member," "patient," "participant," "insured" and "enrollee." For simplicity, UMR uses these terms interchangeably, though they have different meanings in other contexts.

Troxel asserts that he received PrEP-related services on 13 dates from 2021 through 2023, some of which were paid first-dollar, and some of which had co-pays or deductibles, depending on his providers' coding. Ex.10 at 4-5, 6-7. Troxel Dep. 359:8-25.

UMR processed Troxel's claims based on the information his in-network provider (HealthPartners) submitted on the claim form, including the CPT and ICD-10 codes selected by his provider. *E.g.,* Ex.29. In-network providers are required to submit claims consistent with the Guidelines. Stettler-Davis Decl. ¶¶22-24. When Troxel's provider submitted claims with CPT and ICD-10 codes consistent with the Guidelines, UMR recognized those claims as PrEP services and covered them first dollar. Ex.10 at 6-7; Ex.7 at 29-30. Ex.29 at UMR_TROXEL_000000821 (2023 claim ███████████████ ████████ at box 66); Ex.8 (ICD-10 diagnosis code).

In contrast, when Troxel's provider submitted claims with CPT and ICD-10 codes inconsistent with the Guidelines, UMR did not have sufficient information to recognize those as claims for PrEP services. Stettler-Davis Decl. ¶¶22-24. For example, Troxel received partial coverage █████████████████████ when his provider used the generic ███████ code for ██████████████████████████████ Ex.29 at UMR_TROXEL_000000819 (2021 claim ███████████████ at box 21); Ex.9 (ICD-10 diagnosis code); Ex.10 at 4-5. ████████████████████ ████████████████████████████████████████████████ ███████████████████████ Jacobs Decl. ¶85.

Troxel appealed some claims to Quantum, which had final, discretionary authority to resolve the appeal. Ex.17 at PLTFS_000278. Quantum denied those appeals. Ex.22.

Troxel did not properly initiate or exhaust appeals for other claims. Troxel Dep. 99:15-100:20, 104:15-17, 109:20-110:1, 282:24-283:5. In September 2023, Troxel changed employers and no longer participates in a UMR-administered plan. ECF 180 ¶4.

### B.    Philip Kampa

Kampa received health care benefits coverage under a separate health benefit plan sponsored by his employer, Fairview Health Services. ECF 181 ¶4. Kampa's employer "delegated certain responsibilities to" UMR, including interpretation of the plan, claim processing, and appeals. Ex.23 at PLTFS_000041-43. Kampa's plan included coverage terms, limitations, pre-conditions, exclusions, and appeal procedures. *E.g., id.* at PLTFS_000081-84, 115-130.

Kampa asserts that he received PrEP services on at least 5 dates, some of which were paid first-dollar, and others of which had co-pays or deductibles. Ex.10 at 5-6, 7-8. In-network providers like Kampa's (Fairview) (Ex.13 ("Kampa Dep.") 133:3-137:4) are required to submit claims consistent with the Guidelines. Stettler-Davis Decl. ¶¶22-24. When Kampa's provider submitted claim forms with CPT and ICD-10 codes that indicated PrEP services as set forth in the Guidelines, UMR paid Kampa's claims first-dollar. Ex.10 at 7-8; Ex.7 at 29-30. When the provider submitted claims with CPT and ICD-10 codes inconsistent with the Guidelines, UMR imposed cost sharing. Ex.10 at 5-6; Ex.7 at 29-30.

Kampa appealed certain claims. Ex.30 at UMR_TROXEL_000000047-49. As part of UMR's appeal process, UMR submitted Kampa's medical records to an external reviewer—a non-UMR-affiliated entity—to see whether they showed PrEP treatment subject to first-dollar coverage. Ex.28 at UMR_TROXEL_000000036. The external

reviewer determined that ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████. Ex.27. Accordingly, UMR denied Kampa's

appeal. Ex.28. Kampa does not claim to have initiated or completed appeals for his other

claims. Kampa Dep. 136:17-137:10.

## VI.    Plaintiffs Filed This Lawsuit To Recover Costs They Allegedly Paid for PrEP-Related Services

Plaintiffs assert four ERISA claims against UMR [4] alleging that services and

treatments should have been paid first-dollar as PrEP-related preventive care. ECF 64

("SAC"). Count I seeks "payment of benefits due" under ERISA § 502(a)(1)(B). SAC ¶86.

Count II requests "Equitable Relief for Breach of Fiduciary Duty" under ERISA

§ 502(a)(3), including through an "order requiring Defendants to reverse any claims

decisions that did not provide full coverage" (SAC ¶92) along with "monetary relief in the

form of disgorgement of profits, restitution, and surcharge." *Id.* ¶93. Counts III and IV rely

on the same ERISA provisions to request forward-looking declaratory relief "clarifying

that Defendant UMR must cover PrEP Required Services as preventive care without cost

sharing" (*id.* ¶97) and an injunction "requiring Defendants to comply with ERISA and the

ACA by treating PrEP Required Services as preventive care." *Id.* ¶103.

---

[4] Plaintiffs dismissed their lawsuit against Quantum. ECF 104.

**VII.    Plaintiffs Seek Certification of Two Nationwide Classes of Participants in UMR-Administered Plans**

Plaintiffs ask this Court to certify two classes: (1) a "Benefits Class" represented by both Troxel and Kampa for past participants in "an employer-sponsored, non-grandfathered ERISA plan with benefits administered by UMR," and (2) an "Injunctive Class" represented by Kampa alone for individuals currently enrolled in UMR-administered plans. ECF 170. Both classes date back to June 30, 2020, when the USPSTF PrEP recommendations became effective. *Id.*

In support of their Motion, Plaintiffs rely on the opinions and analysis of two putative experts. First, Amy Killelea, a lawyer and advocate, filed a declaration opining that "UMR's claims data contains information sufficient to identify" Plaintiffs' classes. ECF 177 ("Killelea Decl.") ¶23. Despite having no education or certification in coding (Killelea Dep. 17:8-13; 156:14-157:16), Killelea opined that the class of patients could be identified by applying a set of 800+ code combinations to claims data. Killelea Decl. ¶¶82-116 & App'x B. Killelea's selection of codes is based upon survey results and feedback from providers on what codes they *have* or *might* use for PrEP claims, which Killelea conflates with "industry-standard coding practices" that "identify preventive services" that (according to Killelea) should be accepted under federal guidance including FAQ 68.

This is simply Killelea's *ipse dixit*. Killelea never identifies the "industry" in which these codes purport to be the "standard," and acknowledges Killelea has *no* education nor

certification in coding.[5] Killelea acknowledged that there is no other source that identifies these code combinations as "industry standard." Killelea Dep. 74:9-75:1, 111:1-112:20, 114:21-115:2, 115:22-116:7, 126:5-14. While Killelea claims to be "inform[ed]" by a NASTAD Guide, Killelea Decl. ¶¶89-92, NASTAD's corporate witnesses testified that prior to October 2023, there were no codes generally recognized as specific to PrEP, and that as of today there is only one ICD-10 code specific to PrEP and PrEP Ancillary Services. Ellinoff Dep. 63:13-64:10; Ex.17 ("Cramer Dep.") 19:6-24; *see also* Ex.4 at 13 (FAQ example 4 noting that "Z29.81" is "industry standard" for PrEP).

Indeed, around the time Troxel commenced this litigation, Killelea presented a video webinar acknowledging that there was no industry standard for coding. Killelea Dep. 398:18-22 (Killelea stating "there has not been a uniform way to code for PrEP services").[6] Killelea now claims there is a uniform way to code PrEP claims, and it consists of the codes in the Declaration, including, for example, all claims for long term drug management.

Killelea's use of generic codes necessarily includes large numbers of non-PrEP claims. Killelea admitted that only one of those ICD-10 codes is unique to PrEP. All others can be used to describe medical services *other* than PrEP. Killelea Dep. 249:21-250:4. For example, Killelea opined that all claims since 2020 with drug or medication therapy and

---

[5] Killelea states that the Killelea codes are "industry standard" and irrationally leaps to the conclusion that these codes identify PrEP alone. Killelea also baselessly opines that the UMR Guidelines should have included additional codes (though neither the ACA nor USPSTF requires any specific codes). The latter point is irrelevant to class certification, and is not addressed here.

[6] *NASTAD's Updated PrEP, PEP, and Other HIV Prevention Strategies: Billing and Coding Guide*, YOUTUBE, https://www.youtube.com/watch?v=HIW0w2hsrv8 at 39:31-40:19.

monitoring diagnosis codes of 779.899 and Z51.81, and at least one of the identified procedure codes—including office visits, pregnancy tests and kidney function testing—should be assumed to be PrEP services and should be covered first dollar. Killelea Decl. App'x B; Killelea Dep. 80:15-81:18, 209:5-211:14. This methodology leads to claims included in the putative class for a 7-year-old at an office checkup (Killelea Dep. 295:6-298:17; Ex.15 ("Kneuper Dep.") 102:2-104:25), a woman receiving only office visits and pregnancy tests with a secondary diagnosis of acne (Killelea Dep. 270:15-276:15), and ongoing blood tests for a woman with rheumatoid arthritis. Killelea Dep. 214:3-215:16; Kneuper Dep. 79:14-83:16. Such individuals are extremely unlikely to have received PrEP services. Jacobs Decl. ¶¶93-99. Further, several of these individuals *definitively did not* receive PrEP services. *Id.* ¶¶107-09 (services relating to suspicious lump, anxiety, one and heart condition).

Killelea conceded that claims for non-PrEP services may properly have cost sharing. Killelea Dep. 283:16-284:13, 305:8-306:4. But Killelea has no knowledge or expertise about coding of non-PrEP services (*id.* 22:5-11, 63:12-13, 80:19-22, 110:1-14, 217:9-20, 250:9-20), and ***Killelea cannot identify or quantify*** the number of claims in the putative class that relate to services *other than* PrEP. *Id.* 82:3-14.

Plaintiffs relied on a damages expert, Robert Kneuper, to "apply" Killelea's "criteria…to identify the relevant claims for PrEP Ancillary Services" in UMR's claims data by filtering an Excel chart. ECF 179 ("Kneuper Decl.") § 2.0. Kneuper then offered a "preliminary" estimate of damages and class size, asserting that there are 78,017 members of the class with 107,536 claims and more than $4,000,000 in classwide damages. *Id.*

§§ 1.4, 2.1.[7] This "class" is implausible on its face. PrEP services generally require office visits and testing every three months. Ex.3 at 3-5. Accordingly, a set of PrEP claims data over a several-year period would necessarily have many claims per member. But over 80% of the members of Kneuper's putative class have *only a single claim* during the entire class period, which casts serious doubt on how many of these are PrEP claims at all. Declaration of Paul Diver ("Diver Decl.") ¶62, Table 1.

Tellingly, neither Killelea nor Kneuper could state whether, to be a member of the putative class, a patient must actually have received PrEP services. Killelea Dep. 240:8-241:17, 274:2-15; Kneuper Dep. 30:10-31:6, 33:18-23, 34:4-11. Both experts acknowledged that their methodology includes individuals who did *not* receive PrEP services, and neither was able to provide any explanation for how to identify and exclude those individuals. Killelea Dep. 82:3-14, 257:3-259:6; Kneuper Dep. 30:10-31:6, 32:1-5, 33:18-23, 34:4-11.

## LEGAL STANDARD

Class treatment is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotation omitted). Because "[c]lass certification makes mountains out of molehills—sometimes fairly so, sometimes not…Civil Rule 23 imposes stringent requirements before permitting the aggregation of so many claims by so many people in one court." *Speerly v. GM, LLC*, 143 F.4th 306, 315-16 (6th Cir. 2025) (en banc). "A

---

[7] Kneuper does not offer details on the proportion of class membership or damages attributable to the two subclasses Plaintiffs seek to certify. *See generally id.*

district court may not certify a class until it 'is satisfied, after a rigorous analysis,' that Rule 23(a)'s certification prerequisites are met." *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 612 (8th Cir. 2017) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)); *see also Comcast*, 569 U.S. at 34-35 (rigorous analysis also required for Rule 23(b)); *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010) (same).

Plaintiffs must identify an ascertainable class that meets the criteria of Rule 23(a) and (b). "Plaintiffs must establish that the class, as proposed, is objectively ascertainable and a precise definition of the class must be given." *Brown v. Wells Fargo & Co.*, 284 F.R.D. 432, 444 (D. Minn. 2012) (quotation omitted); *see also Sandusky Wellness Ctr., Ltd. Liab. Co. v. Medtox Sci., Inc.,* 821 F.3d 992, 996 (8th Cir. 2016) ("Rule 23 requirements…include[] that a class 'must be adequately defined and clearly ascertainable.'" (quoting *Ihrke v. N. States Power Co.*, 459 F.2d 566, 573 n.3 (8th Cir.), *vacated due to mootness*, 409 U.S. 815 (1972)).

Rule 23(a) demands that Plaintiffs demonstrate that their proposed classes are (1) "so numerous that joinder of all members is impracticable;" (2) involves "questions of law or fact common to the class;" (3) represented by named plaintiffs with "claims or defenses…typical of the claims or defenses of the class;" and (4) that named plaintiffs and class counsel "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997).

The requisite rigorous analysis for each element "includes examination of what the parties would be required to prove at trial," *Avritt*, 615 F.3d at 1029, and "extends to the resolution of expert disputes concerning the import of evidence," *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 783 (8th Cir. 2016) (quotation omitted). "Frequently th[e] 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim" because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the [plaintiffs'] cause of action." *Dukes*, 564 U.S. at 351 (citation omitted). "[T]he district court may—indeed, must— answer merits questions that bear on Rule 23's demands." *Speerly*, 143 F.4th at 317 (quoting advisory committee's note).

Rule 23's "stringent requirements for certification…in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). That is true here, as Plaintiffs fail to demonstrate each of these elements and in fact the record evidence shows that multiple Rule 23(a) factors cannot be met and that none of the Rule 23(b) requirements are present.

## ARGUMENT

### I.    Plaintiffs' Proposed Classes Are Not Ascertainable

"It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *Ihrke*, 459 F.2d at 573 n.3. "A class may be ascertainable when its members may be identified by reference to objective criteria." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017). "Though ascertainability is an implicit requirement that our court enforces through 'a rigorous

analysis of the Rule 23 requirements,' a dispute regarding the method for identifying class members calls for an independent discussion of whether a class is ascertainable." *Id.* Because Plaintiffs cannot show any class that is "adequately defined and clearly ascertainable," no class can be certified.[8] *Sandusky*, 821 F.3d at 996 (quotation omitted); *Brown*, 284 F.R.D. at 444.

### A.   Plaintiffs' Class Definitions and Ascertainability Analysis Relies on Unqualified and Unreliable Expert Opinion

Courts have declined to certify cases where plaintiffs have sought to establish ascertainability based on an unreliable expert opinion. As relevant to this case, courts have found ascertainability lacking where a plaintiff sought to define the class using procedure codes that did not identify a class of individuals who received a particular medical service. *See, e,g.*, *Briscoe v. Health Care Serv. Corp.*, 337 F.R.D. 158, 164-65 (N.D. Ill. 2020); *Daniel F. v. Blue Shield of Cal.*, 305 F.R.D. 115, 122-25 (N.D. Cal. 2014). Plaintiffs' expert Amy Killelea offers several opinions that are outside the scope of the expert's expertise, and which are unreliable and objectively incorrect.

Killelea purports to identify putative class members who received PrEP services but did not receive first-dollar coverage by using CPT and diagnosis codes from UMR's claims data. But Killelea has no coding expertise. Killelea Dep. 17:8-13, 156:14-157:16. Killelea

---

[8] Ascertainability is required even where a plaintiff seeks certification in part under Rule 23(b)(2). *Contra* Plfs.Br. 10 n.9. *E.g.*, *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 933 n.36 (5th Cir. 2023) (clarifying ascertainability is required in Rule 23(b)(2) class actions); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357-60 (4th Cir. 2014) (finding no ascertainability in case seeking certification under both 23(b)(2) and 23(b)(3)); *Brown.*, 284 F.R.D. at 444 (same).

acknowledges that the federal government has not mandated a set of PrEP-related codes (*id.* 65:8-66:6, 128:16-18, 133:11-13, 134:3-17) and concedes that instead the federal government delegates the task of designating specific codes to payers. *Id.* 366:20-367:5. Killelea understands that NASTAD did not intend its billing guide to serve as guidance to payers on what PrEP codes to cover. *Id.* 123:9-17, 396:7-398:10. Killelea is "not aware of another billing and coding guide that is specific to PrEP." *Id.* 146:22-147:2.

Yet Killelea asserts that the set of ten ICD-10 codes and 86 CPT codes in the Declaration are the "industry standard" for PrEP claim coding, and leaps to the conclusion that these "industry standard" codes can identify individuals who received PrEP services. Killelea Decl. ¶¶23, 37. Killelea has no basis for that opinion. No evidence supports Killelea's claim that they are "industry standard." Killelea asks the Court to accept circular reasoning that the codes are included in the report because they are "industry standard" and they are "industry standard" because they are included in Killelea's report. Killelea Dep. 74:9-75:1, 111:1-112:20, 114:21-115:2, 115:22-116:7, 126:5-14. There is no evidence that Killelea's codes are used by anyone, including Killelea before this litigation. *Id.*

Setting aside this unsupported opinion, Killelea concedes that all but one of the codes proffered are *not* specific to PrEP and therefore cannot identify individuals who received PrEP Services. Killelea Dep. 249:21-250:4. Killelea admits that the methodology in the Declaration is overinclusive and captures non-PrEP-related claims. *Id.* 257:3-259:6. But Killelea does not know how many non-PrEP claims are included, or even whether that can be determined. Killelea admitted not doing "an analysis on overinclusivity," and further admitted not being "aware of a way to identify a specific number of overinclusive

claims." *Id.* 82:11-14. Put otherwise, Killelea cannot say which claims in the proposed class are for PrEP services, and which are not. That opinion shows no ascertainable class. *See Briscoe*, 337 F.R.D. at 164 (holding no class ascertainable where expert failed to identify "definite universe" of codes identifying preventive service).

Plaintiffs launder that unsound methodology through a separate expert, Robert Kneuper, who applied Killelea's methodology to UMR claims data to estimate class size and damages. Kneuper performed no analysis or validation of Killelea's methodology. Kneuper Dep. 78:2-7, 82:6-13, 91:1-25. Instead, his "expert" opinion involved following Killelea's instructions and applying basic Microsoft Excel filters to UMR's claims data. *Id.* Kneuper admitted he lacks any subject matter expertise to evaluate whether Killelea's methodology identifies PrEP claims meriting first-dollar coverage (*id.* 20:14-16, 70:9-71:1, 85:13-14) and further admitted that he has no basis to know how many of the 78,017 alleged class members received PrEP services at all. *Id.* 31:2-6, 32:1-5. The Court cannot certify a class premised upon such an unsound expert opinion.

## B.    Plaintiffs Do Not Rehabilitate Their Expert's Unreliable Opinions With Other Evidence of an Ascertainable Class

### 1.    *Plaintiffs' "objective criteria" are ill-defined and subjective*

Plaintiffs assert that their classes are ascertainable because they are "defined by" four "objective criteria."[9] Contrary to Plaintiffs' contention, however, these classes are *not*

---

[9] "(a) enrollment in a non-grandfathered ERISA plan administered by UMR on after June 30, 2020; (b) submission of claims to UMR for PrEP Ancillary Services by in-network providers; (c) coverage of those claims by UMR; and (d) imposition of cost-sharing by UMR." Plfs.Br. 10.

"discernible from UMR's claims data." *Id.* Instead, the data are simply the first step in an inherently individualized review that cannot establish any ascertainable class.

*"PrEP Ancillary Services."* Plaintiffs define "PrEP Ancillary Services" to mean "services encompassed by the [USPSTF] Final Recommendation Statement for PrEP for HIV." Plfs.Br. 9. Yet, as discussed (*supra* pp.3-4), and as Plaintiffs' expert recognizes,[10] neither the USPSTF nor the ACA sets forth a discrete set of circumstances, let alone a set of codes, that always qualify as PrEP preventive care. Instead, services may, in some circumstances, represent PrEP preventive care, while in others may be diagnostic or therapeutic (as opposed to preventive) or entirely unrelated to PrEP. Killelea Decl. ¶36; Stettler-Davis Decl. ¶19. Tests for STIs are just one example, as they could be ordered to diagnose whether an individual has an STI, as part of an unrelated treatment, or in some instances, as a PrEP Ancillary Service. As Killelea admits, first-dollar coverage is only required if PrEP preventive care is actually provided. Killelea Dep. 181:13-182:10, 305:8-306:4. Lacking a mandatory set of codes that must be covered or an objective set of circumstances where services must be covered, identifying PrEP Ancillary Services requires an inherently individualized analysis of patient care.

Other courts have concluded that a similar lack of clarity in terms included in class definitions renders a class unascertainable. *E.g., Steimel v. Wernert*, 823 F.3d 902, 917-18 (7th Cir. 2016); *Brown v. Kerkhoff*, 279 F.R.D. 479, 496 (S.D. Iowa 2012). Whether a

---

[10] Killelea Dep. 65:8-66:6, 136:19-22, 128:16-18, 133:11-13, 134:3-17, 363:5-15; 365:9-14, 366:7-18.

putative class member received "PrEP Ancillary Services" cannot be ascertained on a classwide basis.

*"Coverage of those claims" and "imposition of cost-sharing."* Neither "coverage" nor "cost-sharing" can be ascertained on a classwide basis. The ACA's first-dollar coverage requirements do not apply to all services and treatments related to PrEP, but only when provided to specific subsets of the population who in the medical judgments of individual providers are at heightened risk of contracting HIV. *Supra* p.4. Thus, even if a claim is for "PrEP Ancillary Services," eligibility for first-dollar coverage cannot be determined by reviewing the data alone, because no data indicates whether a patient is in the subset of the population eligible for first-dollar coverage.

Killelea concedes that PrEP-related claims must be paid first-dollar only when the patient is within the USPSTF's "heightened risk" category. Killelea Dep. 305:8-306:4. Killelea asserts that evaluating whether someone is in this category may in some cases be ascertainable in the patient's medical history, but in others, a single conversation with a provider could justify coverage. *Id.* 181:13-182:10. Further, even for individuals that qualify for first-dollar PrEP coverage, the intervals dictating when specific tests and services must be covered first-dollar depend on individual context and test results. *Id.* 49:19-52:15. Thus, the Court cannot determine on a classwide basis whether cost-sharing imposed on those claims violated the ACA or a patient's health plans.

"*Non-grandfathered ERISA plan.*" Nor is this criteria ascertainable. UMR's claims data does not state whether an insurance plan is governed by ERISA or is "non-

grandfathered."[11] Jacobs Decl. ¶72. Kneuper assumes, without any evidence, that the claims data produced by UMR contains only non-grandfathered ERISA plans. *See* Kneuper Decl. § 2.0, n.13. But Plaintiffs' discovery requests for claims data—in response to which the UMR Claims Data was produced—asked for data for *all* "UMR Members," defined as "any individual who receives or received during the Class Period health benefits through an employee-sponsored health plan for which UMR processes claims for benefits." Ex.31 at 3 (Interrogatory 3); Ex.32 at 5 (RFP 8). Plaintiffs did not limit their requests to non-grandfathered plans or even ERISA plans, and have no basis to assume that the information in the UMR Claims Data produced in response to their request is restricted to only that subset. Had Plaintiffs' experts or counsel attempted to analyze and validate their proposed class, they would have quickly seen this. Three of the top ten plans with the highest number of claims in the purported class appear to be governmental entities that are not subject to ERISA. 29 U.S.C. § 1003(b) (excluding governmental plans from ERISA); Diver Decl. ¶29, n.23; App'x 2. And the purported class damages total contains costs from Kampa's March 2023 claims, although Kampa ██████████████████████████████████ ██████████████████████████████████. Kampa Dep. 86:3-22 (████████████ ██████████████████████████). Diver Decl. ¶31, n.26; App'x 3 (damages include Kampa March 2023 claim).

Determining whether any specific claim is subject to the ACA—i.e., is an ERISA non-grandfathered plan—will require individualized inquiry into specific plan documents

---

[11] 45 C.F.R. § 147.140 (defining "grandfathered health plan coverage").

for each potential plan member. It is a "mixed question of fact and law" (*Kulinski v. Medtronic Bio-Medicus*, 21 F.3d 254, 256 (8th Cir. 1994)) and requires an examination of the "surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." *Johnston v. Paul Revere Life Ins. Co.*, 241 F.3d 623, 629 (8th Cir. 2001). For plans governed by ERISA, further review would be required to assess whether the plan's establishment and amendments qualify it for grandfathered status. This factor is also not ascertainable. *E.g., Daniel F.*, 305 F.R.D. at 122-25.

That all class members are allegedly included somewhere in millions of lines of UMR's claims data does not render the classes ascertainable. *E.g., Pete v. State Farm Mut. Auto. Ins. Co.*, 2022 U.S. Dist. LEXIS 237119 (E.D. Ark. Sept. 29, 2022) (denying class certification and finding no ascertainability despite attempt to identify potential class members in defendant's claim file). There is simply no way to determine class membership from the claims data alone. Courts routinely deny class certification where "determining class membership would require the kind of individualized mini-hearings that run contrary to the principle of ascertainability." *Brecher v. Republic of Arg.*, 806 F.3d 22, 26 (2d Cir. 2015). *See also Briscoe*, 337 F.R.D. at 164 (rejecting class defined by medical codes); *Hoekman v. Educ. Minn.*, 335 F.R.D. 219, 250 (D. Minn. 2020); *Hicks v. Sw. Energy Co.*, 330 F.R.D. 183, 189 (E.D. Ark. 2018); *Daniel F.*, 305 F.R.D. at 122-25; *In re Principal*

*U.S. Prop. Account ERISA Litig.*, 2013 U.S. Dist. LEXIS 185665, at \*102-03 (S.D. Iowa Sept. 30, 2013); *Duchardt*, 265 F.R.D. at 444.[12]

### 2. *Plaintiffs rely on a set of overbroad and legally irrelevant codes*

Plaintiffs allege that claims submitted with code combinations not included in the Guidelines were "PrEP Ancillary Services" subject to first-dollar coverage.

But the codes Plaintiffs propose do not identify "PrEP Ancillary Services." The codes in fact identify numerous services other than PrEP. For example, the diagnosis code of "Ongoing long-term drug therapy" includes claims regarding any number of medications including aspirin, cannabis, treatments for nasal congestion, and immunosuppressant drugs. Jacobs Decl. ¶85. The therapeutic drug monitoring code (Z51.81) could be used for drugs to treat bipolar disorder, epilepsy, or asthma. *Id.* ¶87. Plaintiffs' purported class includes nearly 4,000 children under age 12, although PrEP can be prescribed only for adolescents and adults, and first dollar coverage is limited to those engaged in high risk sexual behavior or IV drug use. Diver Decl. ¶69, Table 2. Approximately 45% of those claims are office visits for children with a secondary or tertiary diagnosis code of ADHD, which presents an obvious alternative explanation. Rather than receiving PrEP as their "long term drug," these children are receiving ADHD medication. *Id.* Killelea *did not even*

---

[12] The nuanced analyses required to identify whether an individual received PrEP services and qualified for first-dollar coverage—requiring close examination of differing medical records from differing providers for differing services—distinguishes this case from the rare instances like *McKeage* where courts allow a cursory, straightforward inquiry into individual record documents. *McKeage v. Bass Pro Outdoor World*, , 2013 U.S. Dist. LEXIS 205651, at \*7-8 (W.D. Mo. July 2, 2013) (confirming customer files contain same form contract prior to denying motion to decertify class), *aff'd* 847 F.3d 992, 999 (8th Cir. 2017).

*consider* the additional diagnosis codes in the claims data—including ADHD, arthritis and acne, among thousands of combinations—nor did Killelea attempt to use those to validate data, check assumptions or test theories.[13]

Indeed, there is undisputable *proof* that some claims are unrelated to PrEP. While UMR does not generally have medical records for claims submitted, it located (and its expert reviewed) medical records that exist for a few purported class members who appealed. *Id.* ¶¶106-09. These purported class members were not treated for PrEP; they were treated for conditions such as vaginal lumps, anxiety, and high blood pressure. *Id.*

Killelea asserts that the selected codes were "designed to capture the widest swath of different PrEP encounter types." Killelea Decl. ¶109; Killelea Dep. 57:20-58:2. But whether or not a proposed list of codes "*can* indicate" that the services were PrEP related does not suffice to ascertain a class. Rather Plaintiffs must "provide a definite universe of [] codes" that *do* indicate the services were for PrEP. *Briscoe*, 337 F.R.D. at 164. Killelea repeatedly concedes the coding combinations included in the Declaration are overbroad and overinclusive (Killelea Dep. 78:8-79:2, 257:3-259:6) and admits having conducted no analysis of the extent of overinclusivity (*id.* 63:12-13, 80:19-22, 110:1-14, 217:9-20, 250:9-14), or even whether such an analysis would be possible (*id.* 82:3-14). These admissions are fatal to Plaintiffs' Motion.

---

[13] Some codes are highly unlikely to ever be PrEP *preventive* care. Killelea Decl. App'x B (including "emergency department visit" codes (99282-85)).

Where, as here, there is "no unique code or group of codes—standard or internal—that would readily identify all claims for services" at issue, courts conclude the class is not ascertainable. *Daniel F.*, 305 F.R.D. at 123; *see also Briscoe*, 337 F.R.D. at 164.

### 3. *Plaintiffs cannot rely on self-identification in a subsequent claims process to avoid their burden to demonstrate ascertainability*

Plaintiffs assert that the underlying problems posed by their ill-defined and overbroad methodology can be solved by "self-identification" in the "class claims process." Plfs.Br. 12. Plaintiffs do not explain how this "process" would work, or how the parties would resolve disputes regarding individual "self-certifications." In similar circumstances, courts have rejected plaintiffs' attempts to avoid establishing ascertainability by relying upon later self-identification. *E.g., Hoekman.*, 335 F.R.D. at 250-51; *St. Louis Heart Ctr v. Vein Ctrs. For Excellence, Inc.*, 2017 U.S. Dist. LEXIS 103142, at *10 (E.D. Mo. July 5, 2017). Plaintiffs' solution merely postpones the fundamental ascertainability problems their proposed classes present, because "[t]he use of claim forms and affidavits would devolve into thousands of mini-trials" requiring individual review of medical records. *Alan Presswood, DC., P.C. v. Doe*, 2021 U.S. Dist. LEXIS 156870, at *11 (E.D. Mo. Aug. 19, 2021).

## II. Plaintiffs Cannot Satisfy the Rule 23(a) Factors

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350.

Here, Plaintiffs have not met—and cannot meet—their burden to demonstrate that their claims should be adjudicated on a classwide basis.

### A.    Plaintiffs Fail to Establish Numerosity

The Court cannot certify a class unless Plaintiffs affirmatively demonstrate that the proposed class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).

Plaintiffs claim that their expert "identified 78,017 class members through UMR's claims data produced to date." Plfs.Br. 12 (citing Kneuper Decl. § 2.1). Yet, as discussed above, that expert analysis improperly includes individuals who never received any PrEP services. *Supra* pp.25-27. Other than this unreliable analysis, Plaintiffs offer only their own baseless assertion that the classes are "sufficiently numerous." *Id.* Yet "mere conclusory allegations as to the estimated class size" cannot meet Plaintiffs' burden of proof. *Miller v. RP On-Site, LLC*, 2020 U.S. Dist. LEXIS 221990, at *11-12 (N.D. Cal. Nov. 25, 2020).

The Court cannot casually assume the numerosity element; Rule 23(a) demands a "higher level of proof than mere common sense impression or extrapolation from cursory allegations." *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 681 (S.D. Cal. 1999). Whether or not "the Court *suspects* that there are enough potential class members," that does not suffice to meet Plaintiffs' burden. *Id.* at 682. The Court cannot simply assume the numerosity requirement has been met based on Plaintiffs' speculation alone. *See Wood v. N. Miss. Health Servs.*, 2023 U.S. Dist. LEXIS 175323, at *69 (N.D. Miss. Sept. 29, 2023) ("[A]lthough those odds might be enough for a good wager, [the court] must be mindful

that '[m]ere speculation as to the number of class members—even if such speculation is 'a bet worth making'—cannot support a finding of numerosity." (citation omitted)).

Plaintiffs lack evidence to state with reasonable certainty that any individual member of the estimated class received PrEP Services (apart from Troxel and Kampa), and therefore cannot reliably state there are more than two members of this alleged class. Because Plaintiffs lack a reliable basis "for how [they] arrived at [their] estimate of the size of the class, the court cannot conclude that [Plaintiffs'] estimate is both reasonable and sufficiently large to satisfy Rule 23(a)'s numerosity requirement." *Gries v. Standard Ready Mix Concrete, L.L.C.*, 252 F.R.D. 479, 485 (N.D. Iowa 2008).

### B. Plaintiffs Cannot Demonstrate Commonality

Plaintiffs also must demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

Plaintiffs argue that there are six "common legal questions" and cite three out-of-circuit cases that are more than twenty-years old to argue that "[c]ourts routinely find that similar questions in ERISA cases satisfy commonality." Plfs.Br. 14. But the Supreme Court subsequently clarified that "[w]hat matters to class certification…is not the raising of common 'questions'—even in droves—but, rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (quotation omitted).

Accordingly, courts routinely reject attempts to certify classes based on allegedly common violations of ERISA. *E.g., RJ v. CIGNA Health & Life Ins. Co.*, 2024 U.S. Dist. LEXIS 46485, at *18-45 (N.D. Cal. Feb. 12, 2024) (holding commonality not satisfied merely because defendant had "system-wide practice or policy that affects all of the putative class members"); *Neufeld v. CIGNA Health & Life Ins. Co.*, 2023 U.S. Dist. LEXIS 115660, at *16 (D. Conn. July 6, 2023) ("alleging an across-the-board failure to comply with the DOL regulations" does not demonstrate commonality); *Amy G. v. United Healthcare*, 2020 U.S. Dist. LEXIS 101752, at *10 (D. Utah June 9, 2020) ("it is not enough [for commonality] for Plaintiffs to merely assert that all class member have suffered a violation of the same provision of ERISA"). The same is true here—Plaintiffs do not satisfy the commonality requirement, because UMR's liability to each class member cannot be determined with common proof, rather it will require individual review of medical records. *Dukes*, 564 U.S. at 350.

Under the "rigorous analysis" required by Rule 23 (*id.* at 351), none of Plaintiffs' six "common" questions can be resolved with "common answers."

### 1.    *Plaintiffs cannot establish liability of UMR for cost-sharing in violation of the ACA using evidence common to the class*

Plaintiffs' questions of "whether the policy meets the requirements of the law" and "whether it improperly excludes codes that industry-standard guidance recognize as PrEP-related," (Plfs.Br. 13-14) cannot be answered with common proof. The ACA requires that particular *services* be covered; it does not require that UMR accept certain codes. Thus, there is no common proof establishing liability to the proposed class. Applying the ACA's

PrEP coverage requirements is inherently individualized because neither PrEP services nor eligibility for first-dollar coverage can be determined from codes alone. *Supra* pp.25-27. Plaintiffs' expert acknowledges that the same service or treatments may be subject to first-dollar coverage for some patients and not others depending on each patients' unique circumstances. Killelea Decl. ¶36; Killelea Dep. 181:13-182:10, 305:8-306:4. Killelea further concedes that even for the same patient, the same service may be covered at some times and not others. Killelea Decl. ¶31; Killelea Dep. 49:19-52:15. Thus, "whether the policy meets the requirements of the law" is a question that will have different answers for each individual class member and each individual claim. Regardless of whether UMR's policy contained the codes that Plaintiffs' expert without any basis believes to be "industry standard," codes alone do not resolve the question of whether there was an ACA violation. Determining whether putative class members and potential claims were for PrEP-related services (and qualified for first-dollar coverage) requires an individualized review of claim and medical records relating to each individual claim. *Supra* pp.23-27.

Likewise, individualized issues pervade Plaintiffs' question of "whether the policy resulted in member cost-sharing" because the determination of whether this cost sharing is an "injury" is an individual-specific question. The existence of cost sharing is only relevant if the cost sharing violated the ACA, which as discussed (*supra* p.4) depends on the individual circumstances relating to each particular patient and claim. *RJ*, 2024 U.S. Dist. LEXIS 46485, at *34 n.4 ("The fact that Plaintiffs can reduce their common contention to a binary yes-or-no question does not remedy its commonality problems."). For example, even if a particular individual and service fell within the USPSTF recommendation, a claim

could still not be paid first-dollar if other plan-specific conditions are not met. For example, duplicative claims can properly be denied after the first claim has been paid. Ex.23 PLTFS_000116 (Kampa plan); Ex.24 PLTFS_000256 (Troxel plan). Claims must be correct and "complete" under the Plan. Ex.23 PLTFS_000122; Ex.24 PLTFS_000280. Claims may violate plan-specific statutes of limitations or administrative appeal exhaustion requirements. Ex.23 PLTFS_000130; Ex.24 PLTFS_000287. *See Wit v. United Behavioral Health*, 79 F.4th 1068, 1088-89 (9th Cir. 2023) (requiring exhaustion for all putative class members in ERISA claim for benefits case). "The central relevance of the ERISA plans' specific terms and language is not one that this Court can lightly disregard in evaluating commonality." *RJ*, 2024 U.S. Dist. LEXIS 46485, at *19.

As another court held in denying class certification of a claim similarly premised on an allegedly common violation of the ACA, "in order to determine whether [the ACA violation] occurred and what injuries such practices may have caused would require a case-by-case analysis of the facts related to each individual member of the class, which would defeat the requirement of commonality for certification of a class." *Fox-Quamme v. Health Net Health Plan of Or., Inc.*, 2017 U.S. Dist. LEXIS 35964, at *19 (D. Or. Mar. 9, 2017).

### 2. *Plaintiffs cannot establish that UMR breached any fiduciary duties to the class using evidence common to the class*

Plaintiffs' other purportedly "common" questions do not justify class certification because they wrongly ignore the differences in plan terms that control UMR's duties and any potential breach of fiduciary duty. Evaluating whether UMR was acting as a "plan fiduciary" and whether its "adoption and use of that policy breached its fiduciary

obligations under ERISA" require the Court to review individual plan documents and UMR's conduct in administering each individual plan.

First, the Court must determine whether a particular plan is governed by ERISA and not "grandfathered." As discussed above, these are inherently fact and context-dependent inquiries. *Supra* pp.22-24.

Second, the Court must assess whether UMR exercised fiduciary functions in administering each plan to determine whether UMR is even the proper defendant to a particular plaintiff's ERISA claim. "According to ERISA, a party not specifically named as a fiduciary of a plan owes a fiduciary duty only 'to the extent' that party (i) exercises any discretionary authority or control over management of the plan or its assets;…or (iii) has 'discretionary authority' over plan 'administration.'" *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1002 (8th Cir. 2016) (quoting 29 U.S.C. § 1002(21)(A)). The Supreme Court made clear that ERISA fiduciary status is not dispensed in gross. Instead, an ERISA plaintiff must demonstrate that the defendant "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). This will require an individualized analysis of the plan documents for each putative class member to first determine if UMR was a named fiduciary, and if not, whether and to what extent UMR exercised "discretionary authority" such that it was a fiduciary for the actions at issue.

Troxel and Kampa exemplify the plan-by-plan individualized analyses required. UMR was not the "named fiduciary" for either of the plans in which they participated. Rather, the named fiduciary or plan administrator of each plan "delegated" to UMR certain

defined duties as a third-party administrator. *Supra* pp.8-11. For Kampa, UMR was delegated "certain responsibilities" for "medical claims" and "claims appeals." Ex.23 at PLTFS_000041-43. For Troxel, on the other hand, the plan gave UMR "final, discretionary authority to determine if an initial claim is payable under the terms of the Plan," but assigned authority over any appeals to Quantum, a separate entity. Ex.24 at PLTFS_000278.

Even activities within the delegated authority require individualized context-dependent determinations to assess whether fiduciary duties are implicated. *E.g., Su v. BCBSM, Inc.*, 2024 U.S. Dist. LEXIS 150274, at *10-11 (D. Minn. Aug. 22, 2024) (inquiry into plan language required where defendant was named fiduciary). Plaintiffs cannot just assume that fiduciary status exists. General claims processing—like UMR's processing of allegedly PrEP-related services—is a ministerial, non-fiduciary function. *E.g., Mass. Laborers' Health & Welfare Fund v. BCBS of Mass.*, 66 F.4th 307, 319-20 (1st Cir. 2023) ("although BCBSMA's actions may have constituted a breach of contract, they were not the actions of a fiduciary under ERISA…."); *In re UnitedHealth Grp. PBM Litig.*, 2017 U.S. Dist. LEXIS 208328, at *38-39 (D. Minn. Dec. 19, 2017) ("Plaintiffs do not allege facts showing that Defendants' actions constituted anything more than ministerial claims processing."); *see also Dana Ltd. v. Aon Consulting, Inc.*, 984 F. Supp. 2d 755, 765 (N.D. Ohio 2013) ("That Aon had discretion to select internal procedures (that were allegedly inadequate) for identifying valid claims does not mean it was a fiduciary").

Accordingly, UMR's "fiduciary status is not susceptible of class-wide proof." *In re EpiPen ERISA Litig.*, 2020 U.S. Dist. LEXIS 139066, at *10 (D. Minn. Aug. 5, 2020). *See*

*also Neufeld*, 2023 U.S. Dist. LEXIS 115660, at *25 n.14 (denying class certification given "individualized assessment of the plans and their ASOs would also be necessary to determine whether Cigna was acting as a fiduciary in the first instance").

Courts have denied class certification based on those differences in standards of review complicating the questions of ERISA liability. *See, e.g., RJ,* 2024 U.S. Dist. LEXIS 46485, at *24-25. ERISA does not impose a universal standard of review—*de novo*, arbitrary and capricious, or abuse of discretion—turns on the individual plan language. *E.g., Walke v. Grp. Long Term Disability Ins.*, 256 F.3d 835, 839 (8th Cir. 2001). Accordingly, to decide the standard of review applicable to a given plaintiff's claim for benefits, a determination which may well prove dispositive, the Court must examine the language of each plan to see if it "contains 'explicit discretion-granting language.'" *Id.* (citation omitted).

Courts recognize that such plan-by-plan analyses justify denying class certification. *See., e.g., RJ*, 2024 U.S. Dist. LEXIS 46485, at *24-25 ("[T]he Court must conduct an individualized determination for every health care plan within the class to determine which bucket a plan falls into, *i.e.*, whether it has delegated the determination to Cigna."); *Neufeld*, 2023 U.S. Dist. LEXIS 115660, at *16 ("[E]ven if Cigna's process was identical as to every Plaintiffs' claims, the individual plans are still the necessary starting point to determine the standard of review."); *Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279, 288 (D.N.J. 2013) ("Determining what discretion United enjoys under each plan will require a separate determination, based on each individual plan—potentially numbering in the thousands—and, in some cases, extrinsic evidence.").

Plaintiffs' final proffered question—"whether appropriate equitable relief should be awarded"—does not justify class certification. The right to first-dollar coverage, or lack thereof depending on individual circumstances and plan-specific language, also necessarily affects what and whether any equitable relief is "appropriate." As discussed further below, Plaintiffs' requests for equitable relief, whether via an order to reprocess claims or an amorphous non-specific injunction would itself necessitate an individualized and fact specific process for each potential plaintiff. *Infra* pp.41-42.

The Court should deny ERISA class certification because issues of liability, potential defenses, and remedies depend on plan-specific language, notwithstanding an alleged common policy. *See, e.g., Dennis F. v. Aetna Life Ins.*, 2013 U.S. Dist. LEXIS 137849, at *12-13 (N.D. Cal. Sept. 25, 2013) (defendants' liability to class did not turn on the challenged policy alone); *Graddy v. BlueCross BlueShield of Tenn., Inc.*, 2010 U.S. Dist. LEXIS 14896, at *25  (E.D. Tenn. Feb. 19, 2010) (uniform policies did "not eliminate the need for an individualized assessment as to the ultimate propriety of the benefits decisions"). *Cf. Avritt v. Reliastar Life Ins. Co.*, 2009 U.S. Dist. LEXIS 14000, at *25 (D. Minn. Feb. 23, 2009) ("[W]hen the defendant's affirmative defenses (such as…the statute of limitations) may depend on facts peculiar to each plaintiff's case, class certification is erroneous.") (quotation omitted).

## C.    Plaintiffs' Claims Are Not Typical of the Classes They Seek to Represent

Plaintiffs offer a single conclusory paragraph to assert that Troxel and Kampa are typical because "[b]oth paid cost-sharing for PrEP Ancillary Services." Plfs.Br. 15, citing Fed. R. Civ. P. 23(a)(3). But cost sharing does not demonstrate an ERISA or ACA violation

for themselves much less on behalf of any class. Plaintiffs ignore the multiple ways that their claims are *atypical* of the classes they seek to represent. There is no typicality where, as here, the class representatives are "subject to a unique defense that threatens to play a major role in the litigation." *In Re: Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999).

For example, Troxel's providers sometimes used coding consistent with UMR's Guidelines (and UMR paid-first dollar on such claims) and other times used codes that fail to identify the services as preventive. *Supra* pp.8-10. As Troxel himself asserted multiple times, (Troxel Dep. 244:3-9, 249:1-4), ████████████████████████████████████ ████████████████████████████████████████████████████████████. *Id.* 267:1-269:25, 292:8-25. Further, some of Troxel's claims fall outside even the overbroad code sets offered by Killelea. Killelea Dep. 286:3-291:18; *see also supra* pp.8-10. If Plaintiffs were injured from any violation of the ACA due to a provider's miscoding of PrEP related services, the actions of those providers caused Plaintiffs' damages, not UMR. *See La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 465 (9th Cir. 1973) ("[T]ypicality is lacking when the representative plaintiff's cause of action is against" someone other than the current defendant). And, those codes not included in Killelea's list will not be resolved.

Further, Troxel failed to administratively exhaust many claims, which precludes recovery. Troxel Dep. 99:15-100:20, 104:15-17, 109:20-110:1, 282:24-283:5. Even the limited set of claims that were appealed are atypical: the appeals—through which he provided individualized medical records—were decided and denied by an entirely separate entity. Ex.17 at PLTFS_000278; Ex.22; *see also* Troxel Dep. 85:2-89:25, 125:14-126:18,

290:11-291:7. UMR had no responsibility or fiduciary duties for those appeals. Indeed, Troxel has settled with that entity, former defendant Quantum Health, and has already been made whole for those claims (Ex.25), meaning that any damages he could receive from UMR would be remitted.

Kampa's claims are also atypical. As with Troxel, Kampa's providers used different coding across time and between services, sometimes consistent with UMR's guidelines (and paid first-dollar) and other times, for reasons known only to the providers, inconsistent. *Supra* pp.10-11. Like Troxel, Kampa does not demonstrate he administratively exhausted many claims, precluding recovery under the terms of his plan. *Id.*; Kampa Dep. 136:17-137:10.

The single claim Kampa did appeal confirms that he is atypical. An independent medical reviewer determined that Kampa's records did not reflect a medical judgment of "increased risk," a necessary precondition to ACA coverage, nor did the records indicate he received PrEP services consistent with the appropriate clinical criteria. *Supra* pp.10-11; Exs. 27-28.

These obstacles to Plaintiffs' recovery would unfairly prejudice absent class members by having the resolution of Plaintiffs' claims control any recoveries by the class. "As with commonality, while the named Plaintiffs' claims appear to be typical of some potential class members' claims, they are not typical of all class members' claims. Therefore, Plaintiffs fail to satisfy Rule 23(a)'s typicality requirement." *Thorne v. U.S. Bancorp*, 2021 U.S. Dist. LEXIS 94575, at *6-7 (D. Minn. May 18, 2021).

### III.    Plaintiffs' Proposed Classes Do Not Meet the Rule 23(b) Requirements

Plaintiffs must "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)" through "rigorous analysis." *Comcast*, 569 U.S. at 33. Plaintiffs fail to do so.

### A.    Neither class can be certified under Rule 23(b)(1)(A)

This case does not fit the narrow confines of Rule 23(b)(1)(A). Rule 23(b)(1)(A) applies only when individual trials and potentially inconsistent verdicts would "establish incompatible standards of conduct for the party opposing the class." *See also Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 907 (N.D. Iowa 2008).

There is no risk of inconsistent results here. Both parties agree that UMR (like other payers) is required to cover PrEP services first-dollar for patients of applicable plans who fall within the population identified by the ACA recommendation and have claims properly submitted by an in-network provider. Plaintiffs' example for the supposed risk of "incompatible standards" is non-sensical; it assumes that Courts would come to differing opinions on whether the ACA mandate exists. Plfs.Br. 17-18. Plaintiffs cannot rely on "implausible" scenarios to justify (b)(1) certification. *Casa Orlando Apartments, Ltd. v. Fannie Mae*, 624 F.3d 185, 198 (5th Cir. 2010). Neither party disputes whether UMR must comply with the ACA's preventive care requirements, the dispute is whether a specific patient's claim falls within those requirements. That is necessarily an individualized question for each patient.

The questions in each individual case are fact-specific: did *this* plan participant receive PrEP services, did *this* plan participant fall within the increased risk group of the ACA recommendation at the time of the services, and did *this* provider ascertain and

document an assessment of risk for *this* claim? There would be no conflict if UMR had "to pay damages to some class members but not to others or to pay them different amounts." *Bouaphakeo*, 564 F. Supp. 2d at 907 (quotation omitted); *see also Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 99 (W.D. Mo. 1997).[14] In fact, "certification under (b)(1)(A) is seldom appropriate when dealing with monetary compensation because no inconsistency is created when courts award varying levels of money damages to different plaintiffs." *Casa Orlando Apartments*, 624 F.3d at 197. For the same reason, the injunctive relief class fails. Even if the Court ordered the relief requested by Plaintiffs— for UMR to reverse any claims decisions "that did not provide full coverage" (SAC ¶92) along with "monetary relief in the form of disgorgement of profits, restitution, and surcharge" (SAC ¶93)—this would require a case-by-case determination that each claim met the USPSTF criteria. There is no risk of establishing inconsistent standards.

Plaintiffs' remaining arguments also fail. The breach of fiduciary duty claims do not justify use of Rule 23(b)(1)(A), because the scope of UMR's fiduciary duty (if any) and the evaluations for when (if at all) it was breached necessarily depend on the language in individual plan documents. It would not be "incompatible" for UMR to have one standard apply when it solely processes initial claims (as with Troxel) and another when it processes both claims and appeals (as with Kampa). When the scope of a fiduciary duty varies and is in dispute, certification is not appropriate. *Neufeld*, 2023 U.S. Dist. LEXIS 115660, at *25 n.14 (rejecting similar argument). Nor does the fact that the "ACA's preventive care

---

[14] As discussed further below, the monetary relief in this case is not merely "incidental." *Infra* p.42.

requirement…arises from federal law" justify use of Rule 23(b)(1)(A). Plfs.Br. 18. As the Supreme Court in *Dukes* determined in rejecting certification, the uniform applicability of a federal law does not mean individual claims and liability can be adjudicated class-wide. Like Title VII, ERISA "includes a detailed remedial scheme" and UMR "is entitled to individualized determinations" of each claim under the law. 564 U.S. at 366.

### B. Neither class can be certified under Rule 23(b)(2)

Rule 23(b)(2) certification applies only where "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Neither class meets those requirements, for the reasons described in Sections I (ascertainability), II.B (commonality) and III.A (Rule 23(b)(1)(A)). An injunction "requiring UMR to comply with ERISA and the ACA by treating PrEP Required Services as preventive care on an ongoing basis" (SAC ¶103) or ordering UMR "to reverse any claims decisions" that violated the ACA (SAC ¶92) would not be "final." Instead, it "would merely initiate a process through which highly individualized determinations of liability and remedy are made" to decide whether a given treatment qualifies as "PrEP Required Services." *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 499 (7th Cir. 2012). *See also Amy G.*, 2020 U.S. Dist. LEXIS 101752, at *16-18 (relief not "final" where "it would, at best, only lay an evidentiary foundation for subsequent determinations of…liability and damages." (internal quotations omitted)). Courts cannot "authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360.

For similar reasons, a classwide injunction requiring UMR to "comply with ERISA and the ACA" would not be "appropriate" under Rule 23(b)(2), nor valid under Rule 65(d), which requires that every injunction "state its terms specifically" and "describe in reasonable detail" the "act or acts restrained or required." Plaintiffs cannot request an injunction that "incorporates terms that must be defined according to the specific circumstances of the [plaintiffs]." *Martinez v. Brown*, 2011 U.S. Dist. LEXIS 31247, at *45 (S.D. Cal. Mar. 24, 2011). Because neither the ACA nor the USPSTF imposes a specific, *a priori* standard for which codes must always receive first-dollar coverage for PrEP, Plaintiffs' proposed injunction essentially asks the court to create out of whole cloth a specific standard on how payers must code and process PrEP claims.

Finally, Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 564 U.S. at 360-61. Contrary to Plaintiffs' argument, monetary relief is not merely "incidental," it is central here. Plfs.Br. 18-19. Counts I and II seek "payment of benefits due" (SAC ¶86), "revers[al] and reprocessing of past claims (SAC ¶92), and "monetary relief in the form of disgorgement of profits, restitution, and surcharge." SAC ¶93. Troxel himself testified that ████████████████████████████████████████████. Troxel Dep. 371:21-23.

While Counts III & IV are couched in equitable terms, those counts also seek monetary reimbursement on a going-forward basis. SAC ¶¶97, 103. These "are predominantly forms of monetary damages." *Boyle v. Int'l Bhd. of Teamsters Local 863 Welfare Fund*, 579 F. App'x 72, 76 (3d Cir. 2014). Courts rejected similar attempts to seek

(b)(2) certification in ERISA cases even where plaintiffs include requests for declaratory and/or injunctive relief. *E.g., Lipstein*, 296 F.R.D. at 291-92.

### C.     The Benefits Class cannot be alternatively certified under Rule 23(b)(3).

To utilize Rule 23(b)(3) certification, Plaintiffs must demonstrate both that common questions of law or fact "predominate" and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Courts must assess whether a class action will "achieve economies of time, effort, and expense, and promote…uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997). Plaintiffs cannot meet this standard.

#### 1.      *Common questions do not "predominate"*

Because predominance imposes an "even more demanding" criterion than Rule 23(a) commonality, (*Comcast,* 569 U.S. at 34), the same individualized inquiries undermining Rule 23(a) commonality necessarily demonstrate Plaintiffs failed to show predominance. *Supra* Section II.B (pp.29-36). *See e.g., Amy G.*, 2020 U.S. Dist. LEXIS 101752, at *20; *Franco v. Conn. Gen. Life Ins. Co.*, 299 F.R.D. 417, 421, 430-31 (D.N.J. 2014).

Plaintiffs' contention that the Guidelines represent a "common policy" amenable to classwide relief is illusory. *See, e.g., Amy G.*, 2020 U.S. Dist. LEXIS 101752 at *20 (rejecting reliance on "alleged uniform policy" to seek classwide ERISA relief). The only truly common question—whether PrEP services must be paid first dollar if they fall within the ACA mandate—is not in dispute. The core dispute here involves individualized

questions of *whether* and *how* that common mandate applies to individual claims, which fails to demonstrate Rule 23(b)(3) predominance. *E.g., Osorio v. Tile Shop, LLC*, 2016 U.S. Dist. LEXIS 180077, at *16 (N.D. Ill. Dec. 30, 2016) ("[T]he only actual common issue is undisputed, it appears that the only issues to be addressed at trial will be individual issues."). *Cf. Pipefitters Local 636 Ins. Fund v. BCBS*, 654 F.3d 618, 631-32 (6th Cir. 2011) (reversing class certification where court already ruled on only "truly common" issue). Because participants "will need to present evidence that varies from member to member," the Benefits Class cannot satisfy the predominance requirements. *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005).

### 2.    *A class action is not "superior"*

The superiority requirement addresses the "difficult[y] of managing a class action." *Pipefitters*, 654 F.3d at 630. *See also* Fed. R. Civ. P. 23(b)(3)(D). Again, because determining whether a particular claim of a particular plaintiff qualifies for first-dollar coverage will require individualized review and a series of mini-trials, any class-action trial would be "inefficient and unmanageable." *Amy G.*, 2020 U.S. Dist. LEXIS 101752, at *21-22. Contrary to Plaintiffs' assertion (Plfs.Br. 22), a class action is not superior merely because Plaintiffs allege an ACA/ERISA violation. *E.g., Pipefitters*, 654 F.3d at 631 (reversing certification given "critical, factual threshold issue specific to each and every class member of whether BCBSM was acting as an ERISA fiduciary in each individual, contractual relationship with each plan member").

Indeed, this case is even less appropriate for class treatment than non-ERISA cases, because participants have disclosure and administrative appeal rights under ERISA.

Although Plaintiffs assert that putative class members are "likely unaware" of these rights (Plfs.Br. 22), they are explicitly set forth in both Troxel's and Kampa's plan documents, as well as numerous public and government websites. *Supra* pp.8-11. Plaintiffs' argument that classwide adjudication is superior given privacy concerns is both inapposite—relying on stigma for HIV-positive individuals while PrEP is prescribed only for HIV-negative individuals—and ignores that each and every putative class member had the opportunity to pursue confidential administrative appeals. Plaintiffs' asserted concern over "the low-dollar value of most class members' claims" (Plfs.Br. 22), besides being belied by Troxel and Kampa's own cases which assert more than $1,000 in damages (Ex.11 at 5-6), are also alleviated by the fee-shifting provisions included in ERISA. *See* 29 U.S.C. § 1132(g); *See Doe v. BCBS of Md., Inc.*, 173 F. Supp. 2d 398, 405-06 (D. Md. 2001) ("The attorneys' fee provision also undercuts one of the prime reasons for permitting a class action….") (citing *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985)). Thus, class certification is not appropriate.

### 3.    *Damages are not measurable on a classwide basis*

The 78,017 purported class members include individuals who never received PrEP Services. *See supra* pp.25-27. Plaintiffs' theory of liability requires that each class member actually have received PrEP services, yet Kneuper's damages methodology includes non-PrEP claims. *See supra* pp.14-15. As the Supreme Court stated, "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes

of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35 (reversing class certification). Because Kneuper's damage amount does not "measure only those damages attributable to [Plaintiffs'] legal theory" of PrEP coverage, class certification must be denied.

## **CONCLUSION**

Plaintiffs' Motion for Class Certification should be denied.

Dated: October 24, 2025                    DORSEY & WHITNEY LLP

By */s/ Nicholas J. Pappas*

Shannon L. Bjorklund, MN #0389932
Alan Iverson MN #0399747
David C. Racine, MN #0401060
Brock Huebner MN #0402698
**DORSEY & WHITNEY LLP**
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 340-2600
bjorklund.shannon@dorsey.com
iverson.alan@dorsey.com
racine.david@dorsey.com
huebner.brock@dorsey.com

Nicholas J. Pappas (*pro hac vice*)
**DORSEY & WHITNEY LLP**
51 West 52nd Street
New York, NY 10019
Telephone: (212) 415-9387
pappas.nicholas@dorsey.com

*Attorneys for Defendant UMR, Inc.*