# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Luke Troxel and Philip Kampa, individually and on behalf of all others similarly situated, | Case No.: 23-CV-02521 (JWB/DJF) |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT UMR INC.'s MOTION TO EXCLUDE EXPERT TESTIMONY OF AMY KILLELEA AND ROBERT KNEUPER** |
| v. | |
| UMR, Inc., | |
| Defendant. | |

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 2

   A.   UMR Imposes Cost-Sharing for Preventive Services for PrEP, in Violation
        of the Affordable Care Act and ERISA ..................................................... 2

   B.   Plaintiffs Offer Preliminary Expert Analysis in Support of Their Motion for
        Class Certification Based on the Available Evidence. ............................... 3

      1.  Professor Amy Killelea Provides Preliminary Analysis in Support of
          Class Certification. .................................................................................. 4

      2.  Dr. Robert Kneuper Provides Preliminary Analysis in Support of Class
          Certification. ............................................................................................ 8

III.    LEGAL STANDARD ....................................................................................... 9

IV.     ARGUMENT ................................................................................................... 11

   A.   Professor Killelea's Opinions Are Admissible. ...................................... 11

      1.  Professor Killelea's Analysis Is Relevant and Helpful to the Court at the
          Class Certification Stage ........................................................................ 13

      2.  Professor Killelea Is Well-Qualified to Testify About an Insurer's
          PrEP Coverage Policies and Identify Criteria for a Claims Analysis. ... 14

         i.   Professor Killelea has the necessary experience to testify to
              industry standards for processing PrEP claims. ................................ 15

         ii.  UMR's attacks on Professor Killelea's work with NASTAD
              are similarly unfounded. ................................................................... 18

         iii. A coding certification alone would not qualify an expert to testify
              about the industry standards for claims processing for PrEP services. ........... 20

      3.  UMR's Methodological Criticisms of Professor Killelea's Analysis
          Lack Merit. ............................................................................................. 21

         i.   Professor Killelea has applied a reliable methodology to identify
              PrEP services. ..................................................................................... 22

    ii.    Professor Killlelea's selection of codes is clearly explained and directly tied to the industry standard. ................................................ 23

    iii.   With the limited evidence available, Professor Killelea was not required to conduct the validation UMR asserts is required. ..................... 27

    iv.   The cases relied on by UMR underscore the reliability of Professor Killelea's analysis. ................................................ 30

  B.   Dr. Kneuper's Opinions Are Admissible. ............................................ 32

    1.   Dr. Kneuper Applied Specialized Knowledge. ................................... 32

    2.   UMR's Criticisms of Dr. Kneuper's Analysis Are Not a Basis for Exclusion. ............................................................. 34

    3.   Dr. Kneuper's Methodology Is Independent from Professor Killelea's Analysis. ........................................................ 36

    4.   Dr. Kneuper's Methodology Aligns with Plaintiffs' Theory of Liability. .......... 37

V.    CONCLUSION ................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Advance Tr. & Life Escrow Servs., LTA v. N. Am. Co. for Life & Health Ins.*,
  592 F. Supp. 3d 790 (S.D. Iowa 2022) ........................................................ 37

*Arnold v. Ambulance Serv. of Bristol, Inc.*,
  No. 2:06-cv-105, 2007 WL 5117409 (E.D. Tenn. Aug. 21, 2007) ............................. 34

*In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*,
  9 F.4th 768 (8th Cir. 2021) ............................................................... 10

*Briscoe v. Health Care Services Corporation*,
  337 F.R.D. 158 (N.D. Ill. 2020) ........................................................... 30

*Briscoe v. Health Care Servs. Corp.*,
  No. 16-cv-10294, 2020 WL 291361 (N.D. Ill. Jan. 21, 2020) ..................... 30, 31, 32

*Comcast Corp. v. Berhend*,
  569 U.S. 27 (2013) .................................................................... 37, 38

*Crabar/GBF, Inc. v. Wright*,
  142 F.4th 576 (8th Cir. 2025) ..................................................... 10, 12, 30

*J.S.X. ex rel. D.S.X. v. Foxhaven*,
  330 F.R.D. 197 (S.D. Iowa 2019) ........................................................... 27

*David E. Watson, P.C. v. United States*,
  668 F.3d 1008 (8th Cir. 2012) ............................................................. 10

*Fair Isaac Corp. v. Fed'l Ins. Co.*,
  447 F. Supp. 3d 857 (D. Minn. 2020) ....................................................... 36

*Hayes v. American International Group*,
  No. 09-2874, 2014 WL 3746813 (E.D. Pa. July 29, 2014) ..................................... 31

*Herbst v. Givaudan Flavors Corp.*,
  No. C 17-4008-MWB, 2018 WL 6310271 (N.D. Iowa Dec. 3, 2018) ....................... 13

*Johnson v. J.P. Parking, Inc.*,
  717 F. Supp. 3d 798 (S.D. Iowa 2024) ...................................................... 23

*Kuhmo Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ................................................................ 15

*Meek v. Kansas City Life Ins.*,
    126 F.4th 577 (8th Cir. 2025) ................................................ 38

*Neale v. Volvo Cars of N. Am., LLC*,
    No. 10-4407 (JLL), 2017 WL 1217145 (D.N.J. Apr. 3, 2017)................................... 14

*Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*,
    No. 0:18-cv-63130-RAR, 2020 WL 1666763 (S.D. Fla. Apr. 3, 2020) ..................... 34

*Polaris Indus. Inc. v. Arctic Cat Inc.*,
    No. 15-4129, 2019 WL 1614319 (D. Minn. Apr. 10, 2019)........................................ 36

*In re Pork Antitrust Litig.*,
    665 F. Supp. 3d 967 (D. Minn. 2023) ................................................ 28, 38

*Pritchett v. I-Flow Corp.*,
    No. 09-CV-02433-WJM-KLM, 2012 WL 1326406 (D. Colo. Apr. 17,
    2012) .................................................................................. 29

*Robinson v. GEICO Gen. Ins. Co.*,
    447 F.3d 1096 (8th Cir. 2006) ................................................ 10

*Sampson v. United Servs. Auto. Ass'n*,
    83 F.4th 414 (5th Cir. 2023) ................................................ 38

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
    821 F.3d 992 (8th Cir. 2016) ................................................ 27

*Sihler v. Global E-Trading, LLC*,
    No. 8:23-cv-1450, 2025 WL 1425400 (M.D. Fla. May 16, 2025) .............................. 33

*In re Smitty's/Cam2 303 Tractor Hydraulic Fluid Mktg.*,
    MDL No. 2936, 2023 WL 9064801 (W.D. Mo. Nov. 27, 2023)................................. 37

*Taqueria El Primo LLC v. Ill. Farmers Ins. Co.*,
    577 F. Supp. 3d 970 (D. Minn. 2021)........................................ 10, 37, 38

*Thomas v. FCA US LLC*,
    242 F. Supp. 3d 819 (S.D. Iowa) ................................................ 32

*United States v. Akula*,
    2024 WL 363348 (E.D. La. Jan. 31, 2024)........................................ 17, 18

*United States v. Roach*,
  644 F.3d 763 (8th Cir. 2011) ............................................................... 15

*Wood v. Minn. Mining & Mfg. Co.*,
  112 F.3d 306 (8th Cir. 1997) ............................................................... 11

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
  644 F.3d 604 (8th Cir. 2011) .............................................. 9, 13, 18

**Statutes**

29 U.S.C. § 1185d(a)(1) ....................................................................... 2

42 U.S.C. § 300gg-13(a)(1) ................................................................. 2

**Other Authorities**

29 C.F.R. § 2520.102-3(t) ................................................................. 35

45 C.F.R. § 147.140(a)(2) ................................................................. 35

Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6274 n.50 (2d ed. Apr.
  2023) ................................................................................................ 36

Fed. R. Evid. 702 ............................................................................. 15

*Prevention of Acquisition of HIV: Preexposure Prophylaxis*, USPSTF
  (Aug. 22, 2023),
  https://www.uspreventiveservicestaskforce.org/uspstf/recommendation/
  prevention-of-human-immunodeficiency-virus-hiv-infection-pre-
  exposure-prophylaxis ....................................................................... 3

U.S. Public Health Service & CDC, *Preexposure Prophylaxis for the
  Prevention of HIV Infection in the United States – 2021 Update: A
  Clinical Practice Guideline* (2021),
  https://stacks.cdc.gov/view/cdc/112360/cdc_112360_DS1.pdf ................ 25

# I.    INTRODUCTION

UMR's motion to exclude experts at class certification is more notable for what it does not say than for what it says. UMR does not actually dispute the methodology used by Plaintiffs' experts, which identifies class members using pairs of diagnosis and procedure codes, or "dyads," in UMR's claims data. UMR further does not—and cannot— dispute that this is same methodology used by UMR itself and insurance regulators across the country to determine whether medical services are preventive in nature. Based on over fifteen years of experience in insurance regulation, public health policy, and HIV prevention, Plaintiffs' expert Professor Amy Killelea has testified that the dyad methodology aligns with the regulatory and industry-compliance standards for processing medical claims for preventive services and has proposed a set of criteria to identify preventive claims in claims data that aligns with these standards. Dr. Robert Kneuper has applied criteria developed with that methodology to a subset of UMR's claims data to provide a preliminary assessment of the cost-sharing imposed in violation of the Affordable Care Act ("ACA") in this case.

While UMR frames its *Daubert* motion as challenging the reliability of Professor Killelea's methodology, its criticisms boil down to a dispute over the legal standard that applies in this case. UMR disagrees with Plaintiffs' contention that UMR has a legal duty under the ACA and ERISA to process claims as preventive if the diagnosis and procedure codes on the claim denote services that are part of PrEP treatment. UMR does not dispute that the medical codes selected by Professor Killelea denote services related to PrEP, but contends that because those codes *could* indicate other services, it is impossible to

1

determine whether services are PrEP-related based on the codes. There are good reasons to doubt UMR's litigation position, including because it contradicts how UMR itself adjudicates claims. But at bottom, this is a merits dispute about whether UMR's approach complies with its fiduciary obligations under ERISA and the ACA's preventive care coverage requirement, not the admissibility of Plaintiffs' experts' opinions. Because disputes over the merits of the case are not a basis for exclusion, and because both experts easily satisfy the relaxed *Daubert* standard that applies at the class certification stage, the Court should deny Defendant's motion.

## II.    BACKGROUND

### A. UMR Imposes Cost-Sharing for Preventive Services for PrEP, in Violation of the Affordable Care Act and ERISA.[1]

UMR imposed cost-sharing charges on Mr. Troxel and Mr. Kampa for medical services necessary to maintain a prescription for pre-exposure prophylaxis for HIV, or "PrEP." Waller Decl. in Supp. of Mot. for Class Certification ("Waller Class Cert. Decl.") Ex. 9 at 5, 7 (summary of cost-sharing paid by Mr. Troxel and Mr. Kampa). When it imposed cost-sharing for these services, UMR did so in violation of the ACA and ERISA because those medical services are encompassed by the U.S. Preventive Services Task Force ("USPSTF") Recommendation for PrEP. *See* 42 U.S.C. § 300gg-13(a)(1); 29 U.S.C.

---

[1] The full factual background of this case is described in Plaintiffs' Memorandum in Support of Motion for Class Certification. *See* ECF No. 172 ("Pls.' Class Cert. Mem.") at 3-9.

§ 1185d(a)(1) (cross-referencing provisions of ACA requiring coverage without cost-sharing of preventive services recommended by the USPSTF).[2]

UMR processed Plaintiffs' claims using a policy developed by its parent company, UnitedHealthcare ("UHC"). Waller Class Cert. Decl. Ex. 5 at 6 (UMR stating diagnosis and procedure codes relating to preventive care services are set forth in UHC's coverage guidelines); Waller Class Cert. Decl. Ex. 6 at 2-3 (UMR admitting it applies UHC's preventive service guidelines to all claims processed for plans subject to the ACA). Those policies set forth diagnosis and procedure code combinations that UHC and UMR believe indicate the services provided were related to PrEP. *See* Waller Class Cert. Decl. Ex. 7 at 29-30 ("UHC Policy") (UHC's May 1, 2025, preventive coverage guidelines describing procedure and diagnosis codes). By applying that uniform policy to Plaintiffs' claims for PrEP services, UMR imposed cost-sharing on them and the rest of the proposed classes here. *See* Pls.' Class Cert. Mem. at 8-9 (defining proposed classes).

**B. Plaintiffs Offer Preliminary Expert Analysis in Support of Their Motion for Class Certification Based on the Available Evidence.**

With their motion for class certification, Plaintiffs offered testimony from Professor Amy Killelea and Dr. Robert Kneuper that provides preliminary analysis, based on the evidence available to date, relevant to issues pertinent to class certification. *See* Decl. of Amy Killelea in Supp. of Pls.' Mot. for Class Cert. ("Killelea Decl."), ECF No. 177; Decl.

---

[2] *See also Prevention of Acquisition of HIV: Preexposure Prophylaxis*, USPSTF (Aug. 22, 2023), https://www.uspreventiveservicestaskforce.org/uspstf/recommendation/prevention-of-human-immunodeficiency-virus-hiv-infection-pre-exposure-prophylaxis.

of Robert Kneuper, Ph.D. in Supp. of Pls.' Mot. for Class Cert. ("Kneuper Decl."), ECF No. 179.

### 1. Professor Amy Killelea Provides Preliminary Analysis in Support of Class Certification.

Professor Killelea has more than fifteen years of experience and expertise on the standards for compliance with the preventive care requirements of the ACA and, in particular, standards for processing insurance claims for HIV preventive care. Killelea Decl. ¶¶ 1-18; Killelea Decl. App'x A at 1; Rebuttal Decl. of Amy Killelea ("Killelea Rebuttal") ¶¶ 2-9. As a consultant, advisor, researcher, and government contractor, Professor Killelea has analyzed insurance claims data to determine whether claims for preventive services were covered without cost-sharing. For example, Professor Killelea has:

- Analyzed commercial claims data to assess whether PrEP patients received cost-sharing charges for services encompassed by the USPSTF Final Recommendation Statement for PrEP for HIV ("PrEP Ancillary Services") and recommended combinations of codes to inform the analysis of a CDC-funded study, Killelea Decl. ¶ 10; Decl. of Shannon Bjorklund ("Bjorklund Decl.") Ex. 14 ("Killelea Dep.") 33:3-34:1;

- Worked directly with state and local health departments to implement guidance from the CDC to increase capacity to bill insurers for HIV-related and other preventive services, Killelea Rebuttal ¶ 2; Killelea Dep. 24:16-25:13, 98:21-99:6;

- Reviewed claims data to assess insurers' compliance with preventive services cost-sharing requirements specific to PrEP on behalf of state insurance regulators in Oregon and Kentucky, Killelea Decl. ¶ 14; Killelea Rebuttal ¶¶ 5, 20; Killelea Dep. 107:7-18;

- Assessed utilization management techniques for HIV treatment and prevention medications for the Colorado Department of Insurance by analyzing pharmacy claims date to determine whether insurers complied with state insurance requirements, Killelea Rebuttal ¶¶ 4, 7;

- Analyzed insurance claims data to assess compliance with preventive services requirements based on combinations of diagnosis and procedure codes on behalf of the Vermont Department of Insurance; *id.* ¶¶ 6, 21;

- Provided advice to state insurance regulators on best practices for assessing and regulating compliance with preventive services coverage standards as a Consumer Representative to the National Association of Insurance Commissioners (NAIC), Killelea Decl. ¶¶ 11-13; Killelea Dep. 28:18-29:12;

- Authored or co-authored numerous articles, reports, and presentations on coverage of preventive services in academic, research, and industry settings; Killelea Decl. App'x A at 3-8.

Professor Killelea also oversaw the development of two billing and coding guides for PrEP services on behalf of the National Alliance of State and Territorial AIDS Directors ("NASTAD"). Killelea Decl. ¶ 6. Those guides provided every iteration of CPT and ICD-10 codes that could be used by providers to denote PrEP Ancillary Services. Killelea Decl.

¶¶ 38-40. The most recent guide, published in October 2023, was developed with input from a variety of stakeholders, including providers, public health departments, the CDC, and representatives from America's Health Insurance Plans, a trade group representing the interests of private insurers. Killelea Rebuttal ¶ 10.

Professor Killelea offered testimony about six topics, including: (1) how industry stakeholders understand the ACA's preventive care requirements with respect to PrEP; (2) how providers submit claims for reimbursement for PrEP services; (3) how industry stakeholders differentiate between diagnostic and preventive services for PrEP; (4) whether UMR's coverage policies recognize PrEP services as preventive consistent with the U.S. Preventive Services Task Force Recommendation for PrEP; (5) whether it is possible to determine whether services were diagnostic or preventive from UMR's claims data; and (6) the methodology used to identify UMR insureds who paid cost-sharing for PrEP Ancillary Services. Killelea Decl. ¶ 20.

Professor Killelea described the requirements of the USPSTF's recommendation for PrEP, including the types of services required as part of a PrEP intervention and the intervals on which those services must be provided. Killelea Decl. ¶¶ 2-33. Professor Killelea also noted how providers bill insurance for services using standard codes and the methods available to denote that a service provided was preventive or diagnostic. *Id.* ¶¶ 34-37. Professor Killelea then summarized some of the challenges encountered by providers, labs, and patients with respect to receiving full coverage without cost-sharing for PrEP services and noted that the CDC supported the development of the NASTAD billing and coding guides. *Id.* ¶¶ 38-46. Professor Killelea also described the guidance released by

federal regulators that articulates how insurers must adjudicate claims for services as preventive if the service is documented with industry recognized codes that denote preventive services. *Id.* ¶ 50 (citing U.S. Dep't of Lab., Dep't of Health & Hum. Servs., and Treasury, FAQs About Affordable Care Act and Women's Health and Cancer Rights Act Implementation Part 68 (Oct. 21, 2024)).

Professor Killelea analyzed every iteration of the UHC preventive services policy for PrEP, which is used by UMR, and identified numerous deficiencies that would result in cost-sharing for PrEP services. Killelea Decl. ¶ 52, tbl. 2. Specifically, the policies fail to align to the standards for clinical care for PrEP, as articulated by the CDC and USPSTF, because they do not recognize many procedure and diagnosis codes for PrEP services and misstate the interval for those services by cross-referencing related policies. *Id.* ¶¶ 53-56. Professor Killelea also analyzed UHC's internal communications and described how UHC applied and updated its preventive services policy for PrEP, including how UHC employees misunderstood the required intervals for PrEP services, *id.* ¶ 64; exhibited bias toward individuals eligible for PrEP, *id.* ¶ 75; and acknowledged that UHC's approach to identifying CPT codes was arbitrary, *id.* ¶ 68.

Professor Killelea then used an established a methodology to identify claims where patients received PrEP Ancillary Services but nevertheless were charged cost-sharing by UMR:

- Professor Killelea first assessed the clinical standard of care for PrEP encounters as articulated by the CDC and USPSTF. *See id.* ¶¶ 85-87.

- Professor Killelea then identified diagnosis codes that would indicate the services provided were related to PrEP consistent with that standard of care, based on the NASTAD guide and their prior work identifying diagnosis codes related to PrEP Ancillary Services. *Id.* ¶¶ 96-103.

- Professor Killelea agreed that UHC's policy correctly identified eight diagnosis codes and Professor Killelea identified two additional diagnosis codes that described PrEP services. *Id.* ¶¶ 102-03. In addition, Professor Killelea similarly identified CPT codes that describe the services in the USPSTF recommendation and CDC guidelines for PrEP. *Id.* ¶ 104.

After identifying these codes, Professor Killelea established criteria to identify claims that indicate PrEP Ancillary Services were provided by an in-network provider and the patient was charged cost-sharing. *Id.* ¶ 105-08; Killelea Decl. App'x B.

## 2. Dr. Robert Kneuper Provides Preliminary Analysis in Support of Class Certification.

Dr. Kneuper is an economist with decades of experience in measuring financial harm in a variety of contexts, including through analysis of medical claims data. Kneuper Decl. § 1.1. He has "worked extensively in the health care industry and with health care claims data," both at the FTC and as a consultant. *Id.* Plaintiffs engaged Dr. Kneuper to conduct an analysis of UMR's claims data and to offer opinions as to whether harm to the class could be measured using common methods. *Id.* § 1.3. At this stage, and using the data available, Dr. Kneuper concluded that the financial harm in this case could be measured using common methods with UMR's claims data. *Id.* § 1.4. Based on the codes established

by Professor Killelea to identify PrEP Ancillary Services, he provided a preliminary estimate of the amount class members paid out of pocket for those services. *Id.*

Dr. Kneuper's process involved several steps. First, he conducted an assessment of the UMR claims data to determine which fields contained data necessary for the analysis. Kneuper Decl. § 2; Expert Reply Decl. of Robert Kneuper Ph.D. ("Kneuper Rebuttal") § 2. Second, he limited the data to in-network claims within the class period that, as adjudicated, imposed cost-sharing on the patient. Kneuper Decl. § 2; Kneuper Rebuttal § 2. Third, he applied the diagnosis and procedure code criteria identified by Professor Killelea to the claims data to identify claims with codes denoting PrEP Ancillary Services. Kneuper Decl. § 2; Kneuper Rebuttal § 2. Fourth, he limited the relevant cost-sharing paid only to those claim lines that contained combinations of codes identified by Professor Killelea. Kneuper Decl. § 2; Kneuper Rebuttal § 2. Fifth, he summarized the relevant cost-sharing amounts to generate a preliminary estimate of damages. Kneuper Decl. § 2; Kneuper Rebuttal § 2.

In addition, Dr. Kneuper conducted an analysis of the named Plaintiffs' claims data, and assessed the claims data produced by UMR, concluding that it was incomplete. Kneuper Rebuttal § 2.2.

### III.    LEGAL STANDARD

"The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage where the judge is the decision maker." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011). "At the class certification stage, the Court conducts 'a focused *Daubert* inquiry to assess whether the opinions of [the proposed experts], based

on their areas of expertise and the reliability of their analyses of the available evidence, should be considered in deciding the issues relating to class certification.'" *Taqueria El Primo LLC v. Ill. Farmers Ins. Co.*, 577 F. Supp. 3d 970, 985 (D. Minn. 2021) (quoting *In re Zurn Pex*, 644 F.3d at 610). The Court's analysis "at the class certification stage is preliminary, limited, and focused on the criteria for class certification." *Id.* "[W]here evidence is still evolving and uncertain and the decision is tentative, the Court considers 'the expert testimony in light of the criteria for class certification and the current state of the evidence.'" *Id.* (quoting *In re Zurn Pex*, 644 F.3d at 614).

"Courts should liberally admit expert testimony and resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *See Crabar/GBF, Inc. v. Wright*, 142 F.4th 576, 588 (8th Cir. 2025). The Eighth Circuit has described Rule 702's screening requirement for expert testimony as a three-part test: (1) "the testimony must be useful to the finder of fact in deciding the ultimate issue of fact," (2) "the expert must be qualified," and (3) "the testimony must be reliable or trustworthy in an evidentiary sense." *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021). "Generally, 'the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility.'" *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1014 (8th Cir. 2012) (*quoting Neb. Plastics, Inc. v. Holland Colors Am., Inc.*, 408 F.3d 410, 416 (8th Cir. 2005)). "Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006). The court should exclude the expert's testimony "only if it is so fundamentally unsupported that it can offer no assistance

to the jury." *Wood v. Minn. Mining & Mfg. Co.*, 112 F.3d 306, 309 (8th Cir. 1997) (alterations and quotations omitted).

## IV.    ARGUMENT

### A. Professor Killelea's Opinions Are Admissible.

Professor Killelea's report meets the Eighth Circuit's *Daubert* standard. Professor Killelea has extensive experience and expertise regarding the standard of care for PrEP and has used the same methodology proposed in this case to identify code combinations in market conduct exams for insurance regulators enforcing preventive care coverage requirements. On this motion, UMR does not challenge Professor Killelea's testimony to the extent it provides background information or analyzes the numerous deficiencies in UHC's preventive services policy that imposed cost-sharing on PrEP services. Defs.' Mem. in Supp. of Mot. to Exclude ("Defs.' Mem.") at 5 n.3. Instead, UMR solely challenges Professor Killelea's methodology for identifying PrEP Ancillary Services in claims data. It argues Professor Killelea's opinions are unreliable because Professor Killelea lacks a certification in medical coding and because it disagrees with the opinions. The Court should reject these arguments for several reasons.

First, Professor Killelea's testimony is relevant because it squarely addresses the central issues in this case. Professor Killelea provides background about the regulatory environment and insurance industry, Killelea Decl. ¶¶ 24-51; analyzes deficiencies in UMR's policy and process that results in cost-sharing for PrEP services for insureds, *id.* ¶¶ 52-81; and identifies criteria in claims data to identify individuals who received PrEP Ancillary Services, *id.* ¶¶ 82-110. This testimony is plainly relevant to class certification

and therefore, satisfies the first prong of the *Daubert* analysis. *See Crabar/GBF, Inc.*, 142 F.4th at 587 (requiring that the testimony "must be relevant").[3]

Second, Professor Killelea is well-qualified to testify about how to analyze claims data, particularly PrEP-related claims data, based on extensive experience identifying preventive services from claims data for state insurance regulators and in conducting public health research and analysis. Rule 702 does not prioritize formal credentials over experience. Professor Killelea's extensive experience in the field of HIV services, which includes experience identifying diagnosis and procedure codes necessary to evaluate compliance with preventive coverage requirements for PrEP services, is precisely the kind of practical experience that courts routinely permit.

Third, Professor Killelea's methodology is reliable because it ties directly to the standards for coverage of PrEP services, as articulated by public health authorities, federal regulators, state insurance departments, providers of HIV prevention services, and representatives of the private insurance industry. UMR offers opinions from its own witnesses that disagree with Professor Killelea's conclusions. But disagreements as to the strength of an expert's conclusions or the factual basis for those opinions go to credibility, not admissibility. *See Crabar/GBF, Inc.*, 142 F.4th at 587-88. UMR contends that it is impossible to identify PrEP Ancillary Services by looking at the diagnosis and procedures codes in claims data—despite the fact that UMR's own policy purports to identify PrEP

---

[3] UMR does not seriously contest this, but recycles its reliability argument about Professor Killelea's methodology to assert that the testimony is not helpful for class certification. *See* Defs.' Mem. at 19. Plaintiffs will address those arguments when addressing the reliability of Professor Killelea's methodology.

Ancillary Services by relying solely on diagnosis and procedure codes in claims data. *See* Waller Class Cert. Decl. Ex. 5 (identifying diagnosis and procedure codes used to determine whether services are covered as preventive); UHC Policy at 29-30. In other words, UMR contends that the very methodology it uses to process claims and fulfill its legal duties under ERISA and the ACA is unreliable. Notwithstanding the self-contradictory nature of UMR's position, at bottom, the disputes here are about UMR's legal duty under ERISA and the ACA, not the admissibility of Professor Killelea's testimony.

### 1. Professor Killelea's Analysis Is Relevant and Helpful to the Court at the Class Certification Stage.

Professor Killelea's opinions satisfy *Daubert*'s relevancy requirement because the opinions will help the Court at the class certification stage.

In the Eight Circuit, "the standard for what expert testimony is relevant and helpful under Rule 702 is 'low,' that is, that the expert's evidence should be admitted if it has any tendency to make a fact of consequence more or less probable." *See Herbst v. Givaudan Flavors Corp.*, No. C 17-4008-MWB, 2018 WL 6310271, at *1 (N.D. Iowa Dec. 3, 2018) (quoting *United States v. Holmes*, 751 F.3d 846, 851 (8th Cir. 2014)); *In re Zurn Pex Plumbing Prods.*, 644 F.3d at 613 (noting the relaxed standard due to a lack of a need to protect juries at the class certification stage).

Professor Killelea's opinions meet this standard because they are relevant and helpful for issues of ascertainability. Professor Killelea demonstrates that there is an objective method for identifying claims for PrEP services that did not receive first-dollar

13

coverage. *See Neale v. Volvo Cars of N. Am., LLC*, No. 10-4407 (JLL), 2017 WL 1217145, at *4 (D.N.J. Apr. 3, 2017) (finding an expert opinion was helpful where it addressed the ascertainability of the class, and that whether the expert's opinions are "found to be correct is a [determination] that goes to the weight" of the testimony, not its admissibility). Whether Professor Killelea's analysis is ultimately found to accurately identify codes consistent with the regulatory standards for adjudicating claims for PrEP Ancillary Services is a merits issue, not a basis for exclusion.

Professor Killelea's analysis is also helpful for the issues of commonality and predominance. The opinion shows UMR uniformly applied a common policy that did not appropriately process PrEP claims across the proposed class. Killelea Decl. ¶ 52 (describing deficiencies in UHC policy). This analysis also demonstrates that the harm can be remedied on a class-wide basis because it flows from the uniform policy UMR applies to adjudicate all claims for PrEP Ancillary Services. UMR does not contest that these aspects of Professor Killelea's report are relevant and has not moved to exclude that analysis. *See* Defs.' Mem. at 5 n.3, 19.

## 2. Professor Killelea Is Well-Qualified to Testify About an Insurer's PrEP Coverage Policies and Identify Criteria for a Claims Analysis.

UMR disregards Professor Killelea's extensive experience conducting analysis of preventive care coverage by reviewing claims data, asserting that Professor Killelea is not qualified without a certification in medical coding. These arguments rely on mischaracterizations of both the legal standard under Rule 702 and Professor Killelea's experience.

###### i.    Professor Killelea has the necessary experience to testify to industry standards for processing PrEP claims.

A witness may be qualified as an expert "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "Rule 702 does not rank academic training over demonstrated practical experience." *See United States v. Roach*, 644 F.3d 763, 764 (8th Cir. 2011) (per curiam). "[A]n expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999). UMR identifies no legal requirement that a witness cannot testify about a subject simply because the witness does not have a particular credential.

Nor can UMR dispute the substance of Professor Killelea's experience within the industry, which qualifies Professor Killelea to establish a methodology that will identify PrEP Ancillary Services in claims data consistent with preventive care coverage standards. Professor Killelea has reviewed claims data calls and market conduct exams for coverage of PrEP Ancillary Services for state insurance regulators in Oregon and Kentucky. Killelea Decl. ¶ 14; Killelea Rebuttal ¶ 5. Professor Killelea is currently conducting a similar analysis, using ICD-10 and CPT codes, to review preventive care coverage for the Vermont Department of Insurance. Killelea Rebuttal ¶ 6. Professor Killelea has worked with state and local health departments to translate HIV prevention services into billable CPT and ICD-10 codes and has served on the Billing and Reimbursement Working Group convened by the CDC to address reimbursement challenges related to PrEP. Killelea Rebuttal ¶ 2. Professor Killelea also oversaw the development of the NASTAD billing and coding guide, which includes "every iteration of CPT and ICD-10 codes used by providers to seek

reimbursement for provision of PrEP labs and clinical services." Killelea Dec. ¶¶ 6, 39. Professor Killelea developed, edited, and co-wrote portions of the NASTAD guide in partnership with another billing and coding expert and with input from an advisory group of PrEP providers from a variety of care settings. *Id.* ¶¶ 6, 93-95.

UMR insists that Professor Killelea's testimony exceeds their scope of expertise and that Professor Killelea must establish general expertise in medical coding through a certification. Defs.' Mem. at 13.

But this argument relies on a mischaracterization of Professor Killealea's expertise, background, and testimony. Professor Killelea never "conceded" a lack of expertise in coding for HIV services and preventive services more broadly. *See* Killelea Rebuttal ¶ 6 (describing work assessing preventive care claims data for services related to women's health); Killelea Dep. 29:5-16 (describing experience working on preventive care issues ranging from smoking cessation, colonoscopies, and prenatal depression screenings on behalf of the NAIC consumer representatives); 107:7-18 (describing how the dyad approach is used by state insurance regulators to assess preventive services coverage for areas other than PrEP); *contra* Defs.' Mem. at 21.

To the contrary, Professor Killelea has extensive experience with medical claims billing and coding, including billing and coding related to PrEP and preventative care. *See* Killelea Dep. 24:9-26:12. Specifically, Professor Killelea led NASTAD's billing and reimbursement portfolio, which included cooperative agreements with the CDC, through which NASTAD "provide[d] capacity building assistance and technical assistance to state and local health departments to increase their capacity to bill for services." *Id.* 24:17-22.

In that role, Professor Killelea worked directly with state and local health departments, technical assistance providers, and CDC staff to "provide advice as to how to translate [medical] services into services they could bill public and private payers for." *Id.* 25:11-13. In addition, Professor Killelea "served for a number of years on an HIV billing work group that was led and run by CDC staff" and was "a subject matter expert on HIV prevention and billing for HIV prevention." *Id.* 25:14-18. Professor Killelea's relevant work experience includes the development of two billing and coding guides through NASTAD, which involved "working closely with billing and coding subject matter experts and then working with an array of other subject matter experts, including PrEP providers, labs, and representatives from insurers." *Id.* 26:2-6. Professor Killelea has "worked on research teams to help identify the combination of [] codes to flag [] to identify PrEP claims in large claims data sets." *Id.* 26:9-12.

This testimony demonstrates that Professor Killelea has strong expertise in areas that are directly relevant to this case, having identified code sets associated with both PrEP and other preventive services in a variety of contexts, including when overseeing the development of the NASTAD guide, selecting codes related to PrEP and other preventive services for work on behalf of insurance regulators in numerous states, and recommending codes for a research protocol for a recently published CDC-funded analysis of cost-sharing imposed on patients for PrEP Ancillary Services. Killelea Rebuttal ¶ 26.

These facts easily distinguish Professor Killelea from the expert in *United States v. Akula*, 2024 WL 363348, at *9 (E.D. La. Jan. 31, 2024). In that criminal case related to

hospice billing fraud,[4] the defendant attempted to offer a physician witness as an expert to testify about Medicare billing and coding, and the court allowed the witness to testify about "clinical decision-making regarding hospice eligibility, but not how [the services] should be billed to Medicare." *Id.* at *10 (alteration omitted). The Court limited the testimony "based on a variety of problems with his testimony in addition to the fact that he was not a certified professional coder," including limited training in hospice-related Medicare billing and coding. *Id.* In sharp contrast, Professor Killelea has published on the topic of billing and coding for PrEP and other preventive services (including through the NASTAD guide), has demonstrated a deep understanding of claims adjudication and coding review for PrEP in particular, and has been relied upon for expertise on those topics by numerous state insurance regulators. *See* Killelea Rebuttal ¶¶ 2-7.

ii.    ***UMR's attacks on Professor Killelea's work with NASTAD are similarly unfounded.***

UMR asserts that the NASTAD guide was nothing more than the product of a survey of providers that compiles commonly used codes and that insurers were not invited to participate. Defs.' Mem. at 14. That assertion is wrong.[5] A survey was conducted of public

---

[4] While *Akula* is distinguishable on the facts alone, the court in that case also applied a different legal standard because the witness was testifying to a jury—when Rule 702's gatekeeping function is at its height. 2024 WL 363348, at *9; *see In re Zurn Pex*, 644 F.3d at 613. And on the defendant's motion for a new trial based on the limitation of his expert witness, the court noted no injustice resulted from the exclusion because the defendant had testified at trial that his coding was incorrect and he should not have received Medicare payment. *See Akula*, 2024 WL 363348, *6 n.38, 10.

[5] Tellingly, UMR offers no citation that supports this assertion. Defs.' Mem. at 14. It only cites to Professor Killelea's deposition and the deposition of a NASTAD witness, Nicole Elinoff, who both testified that the guide was not intended to be prescriptive or a stand-in

health departments and PrEP providers, but the guide was not simply a compilation of survey results, as UMR inaccurately asserts. *See* Decl. of Shannon Bjorklund Ex. 16 ("Elinoff Dep.") 23:1-9 (discussing questionnaire sent to advisory group); Killelea Decl. ¶ 40 ("The guide was developed in consultation with an advisory group of PrEP providers and billing and coding staff and was reviewed extensively by a leading insurance industry trade group."); *accord* Killelea Dep. 119:12-121:16 (describing a multidisciplinary team of experts and the process for developing the NASTAD guides). The guide was developed by NASTAD with CDC support and used the clinical recommendations from the CDC as a primary resource. Killelea Decl. ¶¶ 38, 88. An advisory committee of PrEP providers oversaw the development of the guide. *Id.* ¶¶ 92-93.

UMR also asserts: "NASTAD *did not invite payers to participate*." Defs.' Mem. at 15. This is also wrong, as demonstrated by the section of testimony immediately after the provision cited by UMR. The testimony cited by UMR from the NASTAD witness was: "We did not invite payers to participate in *these advisory group meetings,* correct." Elinoff Dep. 20:3-4 (emphasis added). The meetings Ms. Elinoff referred to were two advisory group meetings, which were one part of the overall process to develop the guide. *Id.* 19:23-20:1 (asking Ms. Elinoff about "two advisory group[] meetings"). Shortly after this

---

for payer guidance. *See* Killelea Dep. 123:9-17; Elinoff Dep. 56:1-8, 60:8-10, 68:16-19. Professor Killelea's opinion is entirely consistent with that fact because they did not simply adopt all codes in the NASTAD guide. Killelea Decl. ¶¶ 91-104. Instead, the guide was a resource and the review process used to create that guide provides additional objective support for the codes identified by Professor Killelea. *Id.* ¶¶ 88-90; Killelea Dep. 65:3-7 ("The NASTAD guide is a helpful resource to identify and to confirm industry standard . . . .")

question, Ms. Elinoff made clear that insurance industry representatives *were* included in the process: "We spoke with the America Health Insurance Plans. AHIP did help with reviewing the guide. . . . AHIP reviewed the guide and provided some comments." *Id.* 21:21-24, 22:3. Two representatives of AHIP were engaged on multiple calls, suggested edits to the guide, agreed to solicit additional feedback from AHIP members to be incorporated into the guide, and offered to disseminate the guide to AHIP members once it was finalized. Killelea Rebuttal ¶ 13; Killelea Dep. 121:8-10.

### iii. *A coding certification alone would not qualify an expert to testify about the industry standards for claims processing for PrEP services.*

The coding certification identified by UMR is a relatively short, technical program for entry-level coding positions with medical providers, often obtained through a two-year associates degree program. *See* Decl. of Janice G. Jacobs ("Jacobs Decl.") ¶ 77. Defendant's proposed expert apparently completed that certification through a six-month program and 40-hour "boot camp." *Id.* ¶ 6. But a generalized certification would not provide specialized knowledge in HIV treatment interventions, the specific codes used in that context, or the USPSTF and CDC clinical standards that establish the range of treatments provided as part of the PrEP intervention. Professor Killelea has both a bachelor's degree and a law degree, and hands-on experience researching and studying the HIV prevention interventions established by public health authorities. Killelea Decl. App'x A at 3-8; *see* Elinoff Dep. 102:13-15 (testifying that "Professor Killelea is an expert in this field, and they have produced many publications on PrEP coverage and PrEP financing in the last several years").

Moreover, in the field of HIV public health policy and insurance oversight, a coding certification is not required to analyze claims data. The co-chairs of the CDC Billing and Reimbursement Working Group did not have coding credentials. Killelea Rebuttal ¶ 7. The state insurance regulators in Colorado and Vermont who conduct similar analysis of claims data did not have coding certifications. *Id.* Indeed, UHC's own witness, Dr. Stettler-Davis, lacks coding credentials and is not a certified coder, Stettler-Davis Decl. ¶ 2, yet he purports to provide testimony about the UHC preventive services policy and was appointed to the group responsible for developing the policy, *id.* ¶¶ 22-23. In contrast, UHC's internal analyst, Laura Warner, is a certified coder but nevertheless demonstrated a serious lack of understanding of the PrEP intervention. *See* Killelea Decl. ¶ 64 (explaining how Warner's decision to cross-reference other preventive service policies, which have different requirements and intervals for services, reflects a fundamental misconception of the PrEP intervention).

## 3. UMR's Methodological Criticisms of Professor Killelea's Analysis Lack Merit.

At bottom, UMR presents a series of disputes about the factual bases for Professor Killelea's opinions, based on the analysis of its own employees and witnesses. Specifically, UMR disputes the codes Professor Killelea concluded denote PrEP Ancillary Services. Those are factual disputes that go to the weight of Professor Killelea's testimony—not admissibility. UMR does not seriously dispute the underlying dyad methodology because UMR itself applies the very same method to identify PrEP services.

### i. *Professor Killelea has applied a reliable methodology to identify PrEP services.*

Professor Killelea applies the dyad methodology to identify claims for PrEP Ancillary Services—a methodology that Professor Killelea did not invent, but is commonly used by insurers, insurance regulators, and even by UMR and UHC in this case.

The dyad methodology is appropriate because it is the industry standard for identifying preventive services in processing medical claims. State insurance regulators, including regulators in Oregon, Vermont, and Kentucky, all use this method to measure compliance with preventive care coverage mandates. *See* Killelea Rebuttal ¶¶ 5, 6, 20, 21. UHC itself uses this methodology. Killelea Rebuttal ¶ 22; UHC Policy at 29-30 (applying that purports to cover PrEP services based on diagnosis and procedure code combinations). UHC's own staff acknowledge that they consider services to be preventive based on combinations of diagnosis and procedure codes. *See* Stettler-Davis Declaration ¶¶ 17, 21 (stating that UHC "maintains that the procedure codes and diagnosis code combinations outlined in the Coverage Determination Guideline best ensures claims that align with USPSTF recommendations are appropriately processed"). The dyad methodology also aligns with the industry standard set by federal law and regulation, which requires insurers to cover services as preventive based on the data on the claim unless they receive specific information to the contrary. *See* Killelea Decl. ¶ 50 (citing U.S. Dep't of Lab., Dep't of Health & Hum. Servs., and Treasury, *FAQs About Affordable Care Act and Women's Health and Cancer Rights Act Implementation Part 68* (Oct. 21, 2024), https://www.cms.gov/files/document/faqs-implementation-part-68.pdf.).

UMR contends that the methodology is both novel and unreliable, established only by Professor Killelea's *ipse dixit*. Defs.' Mem. at 20-22. This argument disregards UHC's **own policy** and Professor Killelea's work applying the same methodology in a variety of settings. As explained above, Professor Killelea *has* applied combinations of CPT and ICD-10 codes to identify PrEP services in work performed for state insurance regulators. Killelea Rebuttal ¶¶ 6, 20, 22.  UMR also attacks Professor Killelea's work on the NASTAD guide as inapplicable because NASTAD "did not use codes to identify PrEP services," but "used PrEP services to identify codes." Defs.' Mem. 21. But this semantic argument simply disputes the industry standard, as acknowledged by Professor Killelea, NASTAD, and even UHC: the combination of procedure codes, diagnosis codes, and modifiers on the claim are used to determine what service was provided. Killelea Decl. ¶ 37; Bjorklund Decl. Ex. 20, ECF No. 226 ("NASTAD Guide") at 12 ("The combination of all of these code types is used to accurately describe the service(s) that were provided during an encounter."); Stettler-Davis Decl. ¶ 21 (noting that UHC relies on the procedure and diagnosis code combinations to process claims in accordance with the USPSTF recommendations); UHC Policy at 29-30. Professor Killelea applies this methodology here to determine what claims UMR failed to process consistent with the USPSTF recommendation.

### ii. *Professor Killlelea's selection of codes is clearly explained and directly tied to the industry standard.*

UMR's disagreement with Professor Killelea's analysis is not a methodological disagreement, but instead, boils down to its disagreement over *which* codes were selected.

That is a factual dispute that goes to weight of the evidence, not admissibility. *See Johnson v. J.P. Parking, Inc.*, 717 F. Supp. 3d 798, 810 (S.D. Iowa 2024) (rejecting defendant's Daubert argument that expert's survey was unreliable due to an overinclusive sampling method because defendant could cross-examine the expert about his sampling choices at trial). The Court could resolve this motion on that basis alone.

Professor Killelea's opinions are also clearly tied to the industry standard for processing PrEP claims. The primary sources were the CDC Guidelines and USPSTF recommendation, which identify the types of services that are integral to PrEP treatment and are, therefore, encompassed by the preventive services requirement. Killelea Dep. 65:12-21 (describing primary sources for identifying industry standard codes for PrEP services). These sources are drafted by federal agencies responsible for establishing the standards of care for preventive services and PrEP treatment. Killelea Decl. ¶¶ 85-90. Professor Killelea relied on the NASTAD billing and coding guide to identify the universe of codes that describe those services. *Id.* ¶¶ 91-95.

Of the ten diagnosis codes Professor Killelea identified, UHC's policy contains eight of those codes. *See* Killelea Decl. ¶ 98; UHC Policy at 29-30. In other words, Professor Killelea *agreed* with UHC's selection of a vast majority of diagnosis codes. Professor Killelea then relied on the NASTAD guide and professional experience to conclude that two additional codes appropriately identify PrEP Ancillary services. Killelea Decl. ¶¶ 102-03. Professor Killelea's rationale for including those two additional codes is clearly explained. *Id.* The codes describe an "encounter for therapeutic drug level monitoring" and "other long term (current) drug therapy," which "reflect the ongoing PrEP

monitoring associated with PrEP adherence visits." *Id.* Under the CDC Guidelines and USPSTF recommendation, ongoing lab tests are related to monitoring a patient's underlying use of the antiretroviral medication. Killelea Rebuttal ¶ 25; *see* U.S. Public Health Service & CDC, *Preexposure Prophylaxis for the Prevention of HIV Infection in the United States – 2021 Update: A Clinical Practice Guideline* at 43-44, 45-46 (2021), https://stacks.cdc.gov/view/cdc/112360/cdc_112360_DS1.pdf (describing clinical drug monitoring requirements for PrEP). The additional codes are also noted in several other publications from federal guidance for qualified health centers and state health departments describing appropriate codes for PrEP services. Killelea Rebuttal ¶ 25.

UMR criticizes Professor Killelea's codes as "generic" and asserts it is impossible to identify PrEP data with those codes. Defs.' Mem. at 24. This appears to be a new position taken by UMR in litigation, as UHC has relied on more generic codes when there was not a more specific code available. Specifically, UHC agreed that it was appropriate to use a more generic code for an injectable form of PrEP. Killelea Decl. ¶¶ 76-81. UHC employees explained that because there were no specific codes available for an injectable PrEP drug, UHC would use generic code J3490, which is for unclassified drugs. Decl. of Derek Waller in Opp. to Mot. To Exclude ("Waller Opp. Decl.") Ex. 1 at 000041536 ; Waller Opp. Decl. Ex. 2 at 3 (UHC policy draft identifying J3490 for injectable PrEP); Waller Opp. Decl. Ex. 3 at 3 (UHC meeting minutes approving use of J3490 for injectable PrEP); Killelea Decl. ¶¶ 78-80 (analyzing UHC correspondence discussing J3490). In other words, UHC's own policy used a generic code for other types of PrEP services, even though a more specific code did not exist. UMR does not acknowledge that fact.

Of the CPT codes Professor Killelea identified, all are types of services identified in the CDC PrEP Guideline, the USPSTF recommendation, and the NASTAD Guide. Killelea Decl. ¶ 104. Despite its general objections to Professor Killelea's qualification, UMR does not identify a single CPT code it asserts does not denote a service encompassed by the USPSTF recommendation. *See generally* Defs.' Mem. 14-18. That is because each of the codes included in Professor Killelea's analysis denotes a service expressly recognized as encompassed by the PrEP recommendation. *Compare* Killelea Decl. ¶ 104 (describing services and associated CPT codes) *with* Waller Class Cert. Decl. Ex. 2 at 5 (federal guidance describing the same services as covered under the PrEP recommendation).

UMR argues that because the diagnosis and procedure codes Professor Killelea selected are not unique to PrEP services, the entire analysis is unreliable. Defs.' Mem. at 25. But, this is a challenge to the sufficiency of the evidence to ascertain a class—not Professor Killelea's analysis or methodology. Professor Killelea does not purport to identify codes unique to PrEP; rather, in line with the standards set by regulatory guidance, Professor Killelea identifies codes that are used to denote PrEP Ancillary Services. *See* Killelea Rebuttal ¶ 11; Killelea Dep. 206:20-207:7, 240:12-21. As Professor Killelea explained, "[t]hat standard assumes a certain level of overinclusivity so as not to . . . charge cost-sharing unduly." *Id.* 258:12-14. Thus, UMR's disagreement is not with the codes selected per se—it is with the requirements of ACA as understood by federal regulators. That disagreement does not go to the reliability of Professor Killelea's methodology—it goes to the merits of this case.

26

Moreover, Plaintiffs have noted that the issue of over-inclusivity can be handled in the class claims administration process. Pls.' Class Cert. Mem. at 12. UMR disputes that process and asserts the class is nevertheless not ascertainable, but that argument is a merits issue of law, not a question of Professor Killelea's analysis of the industry standard for PrEP claims processing. The upshot of UMR's argument is that unless an expert can single handedly propose a methodology that definitively identifies each and every class member with absolute certainty at the time of class certification, the expert's testimony is unreliable. That is not the standard in the Eighth Circuit. *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016) (rejecting administrative feasibility as a requirement of ascertainability). Plaintiffs need to establish that objective criteria exist that can allow a person to be identified as a class member. *J.S.X. ex rel. D.S.X. v. Foxhaven*, 330 F.R.D. 197, 206 (S.D. Iowa 2019) ("Ascertainability does not require that a plaintiff must be able to identify all class members at the time of class certification; rather, a plaintiff need only show that class members can be identified." (quotation omitted)).

### iii.    With the limited evidence available, Professor Killelea was not required to conduct the validation UMR asserts is required.

UMR contends that Professor Killelea did not conduct sufficient testing, such that their opinions are unreliable. Defs.' Mem. at 22. But UMR's dispute is not with the methodology—it is with the fact that the codes selected by Professor Killelea (and the codes UMR itself uses to determine whether services are preventive) could be used to describe other types of services. The core of each of these so-called "red flags" is, once again, a dispute over the merits of the standards used to adjudicate PrEP claims.

27

For example, UMR criticizes Professor Killelea because some diagnosis codes for long term medication could refer to other conditions because Professor Killelea did not conduct an individualized investigation of various claims identified. *See* Defs.' Mem. at 23, 26. Professor Killelea has already acknowledged that all diagnosis codes with the exception Z29.81 (including codes recognized by UHC and UMR) could be used to indicate services other than PrEP. Those codes are included pursuant to industry standards set by regulatory guidance and as understood by insurance regulators nationwide.

UMR's second proposed expert, Dr. Paul Diver, asserts that because claims were not repeated, the patients probably were not receiving PrEP services. Decl. of Paul Diver, Ph.D. ¶ 64. But this criticism assumes a complete universe of claims data. The data available to Plaintiffs is incomplete. Kneuper Rebuttal at 8 ("Defendant does not disagree with my expert opinion that the UMR claims data is incomplete nor provide evidence that it is complete."). UMR refused to produce claims data for the class period in this case and produced limited claims data for some code combinations after being ordered to do so by the Magistrate Judge.[6] As Dr. Kneuper noted, the data here does not include all claim lines for the named plaintiffs and there is a substantial amount of information missing. Kneuper

---

[6] At the time of that motion, the court did not have the benefit of expert analysis and the court accepted UMR's assertions that producing more claims data would be burdensome. Dec. 9, 2024 Hr'g Tr. at 48:20-49:3 (Magistrate Judge describing limiting claims data production at that stage of the case "to balance the burden of searching on defendant with plaintiffs' need for discovery on numerosity"), ECF No. 108. But as Plaintiffs' experts' analysis has shown, UMR's prior assertions were incorrect. Accordingly, Plaintiffs will seek the supplemental claims data for all the code combinations identified by Professor Killelea, as discovery is ongoing. *See* ECF No. 169 at 1 (requiring completion of discovery by June 1, 2026).

Decl. at 7 n.20. In any event, the "existence of causes not eliminated pertains to weight—not admissibility." *In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 992 (D. Minn. 2023).

UMR's criticisms of Professor Killelea's proposed validation methodology to test the rate of over-inclusivity of the codes selected go to the weight of the evidence here, not admissibility. Defs.' Mem. at 23-24. "[A]n otherwise reliable methodology does not instantly become unreliable merely because the witness did not test it thoroughly in all applicable situations. Instead, once a court is satisfied that the methodology is generally reliable, suggestions that the witness should have engaged in additional testing to achieve certainty in his or her conclusions simply go to the weight of the opinion, not its admissibility." *Pritchett v. I-Flow Corp.*, No. 09-CV-02433-WJM-KLM, 2012 WL 1326406, at *5 (D. Colo. Apr. 17, 2012) (citing *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1236 (10th Cir. 2005)).

UMR itself does not conduct the testing it says Killelea should have performed when it evaluates its own claims. For example, UMR argues that Professor Killelea should have looked at secondary diagnosis codes, patient ages, and overlapping PrEP procedures. Defs.' Mem. at 23-24. But UMR considers none of these criteria when it adjudicates claims under the UHC policy. UHC Policy at 29-30 (describing code combinations it recognizes as preventive).

UMR also contends that Professor Killelea's codes are unreliable because they capture individuals under the age of 12. Defs.' Mem. at 23. But UMR itself does not consider age when processing PrEP claims, nor has it pointed to any factual basis to establish an age cut-off. *See* UHC Policy at 29-30. As Professor Killelea explained, the

CDC guidelines and FDA label for PrEP do not establish a bright-line rule for an age cut-off. Killelea Rebuttal ¶ 28. Instead, the FDA label indicates that PrEP requires a minimum weight of 77 pounds. Killelea Dep. 198:12-18; Killelea Rebuttal ¶ 28. UMR cites no evidence for an age cut-off, other than the phrase "adults and adolescents" in the USPSTF recommendation statement. Defs.' Mem. at 10. Under these circumstances, Professor Killelea's decision not to include an arbitrary age limit unsupported by any clinical evidence or data is supported by the evidence, and is simply another instance where UMR disputes the factual basis for the analysis. *See Crabar/GBF, Inc.*, 142 F.4th at 587-88 ("[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility . . . ."). Any further narrowing required to confirm an individual's membership in the class can take place during the class claims administration process. *See supra* Section IV.A.3.ii.

### iv. *The cases relied on by UMR underscore the reliability of Professor Killelea's analysis.*

UMR relies on two out-of-circuit cases to assert that Professor Killelea's testimony should be excluded. Both cases are inapposite because they involve substantial factual differences.

In *Briscoe v. Health Care Services Corporation*, the court found that the plaintiffs could not certify a class because it had previously excluded the testimony of their expert witness, whose analysis was necessary to ascertain the class. 337 F.R.D. 158, 164-65 (N.D. Ill. 2020) ("*Briscoe II*") (applying class certification standard). The underlying *Daubert* opinion that preceded that ruling makes clear that the *Briscoe* experts' analysis was entirely

different than the analysis here. *See Briscoe v. Health Care Servs. Corp.*, No. 16-cv-10294, 2020 WL 291361 (N.D. Ill. Jan. 21, 2020) ("*Briscoe I*") (applying *Daubert* standard). In that decision, the court was concerned that the plaintiff's experts "fail[ed] to propose a set of . . . codes that encompasse[d] all [relevant] care." *Id.* at *5. That was because the codes proposed might not identify all patients who sought the relevant preventive care "without submitting" claims. *Id.* In other words, the methodology proposed did not capture the full universe of potential class members, which included individuals who never submitted claims for services in the first place.

The supposed issue UMR complains of here is precisely the opposite: it does not contend that Professor Killelea has failed to capture the universe of individuals who received PrEP services—instead it complains that Professor Killelea's codes indicate some individuals who did *not* receive PrEP Ancillary Services. But that fact is not fatal to Professor Killelea's analysis because, as explained above, the methodology aligns with the legal requirements for processing claims for preventive care. *See supra* Section IV.A.3.ii. Moreover, any individuals who did not receive PrEP Ancillary Services can be filtered out through a claims process.

*Hayes v. American International Group* is even further off point. No. 09-2874, 2014 WL 3746813 (E.D. Pa. July 29, 2014). In that disability insurance case, the parties disputed whether plaintiff had impermissibly worked as an occupational therapist while he received total disability benefits. *Id.* at *7. The plaintiff's expert opined, in a single conclusory paragraph, that the CPT codes plaintiff had billed could only reflect acupuncture services, not therapy services. *Id.* at *30. The court excluded the expert, who failed to provide a CV

or articulate any experience with medical billing codes. *Id.* at *28-30. That expert had merely printed a list of the codes used by the plaintiff and asserted (with no citations, references, or examples) that the codes could not be used for occupational therapy. *Id.* at *30. In sharp contrast here, Professor Killelea has extensive experience conducting claims analysis for preventive services using codes, the codes selected are documented in numerous industry guides, and the codes were selected based on analysis of primary source material from the CDC and USPSTF. *See* Killelea Rebuttal ¶ 25.

## B. Dr. Kneuper's Opinions Are Admissible.

UMR seeks to exclude Dr. Kneuper's testimony on the grounds that he did not apply specialized knowledge and because it disputes the analysis. Notably, UMR does not dispute Dr. Kneuper's methodology or process; it simply disagrees with his conclusions, which is not a basis for exclusion. *See Thomas v. FCA US LLC*, 242 F. Supp. 3d 819, 823 (S.D. Iowa) ("The primary concern of Rule 702 is the underlying principles and methodology utilized by the expert, rather than the expert's conclusions."). The Court should consider Dr. Kneuper's analysis and deny Defendant's motion because Dr. Kneuper is qualified, applied a reliable methodology, and the testimony is relevant to the issues related to class certification.

### 1. Dr. Kneuper Applied Specialized Knowledge.

UMR does not dispute Dr. Kneuper's qualifications as an economist. Instead, it mischaracterizes his work as something the Court could simply do on its own and argues that his testimony is therefore unhelpful.

The specialized analysis Dr. Kneuper performed speaks for itself. Dr. Kneuper analyzed nine separate datasets produced by Defendants and combined those into a single dataset with over 6 million rows of data for over 1 million claims. Kneuper Rebuttal § 3.3. Once combined, the relevant data fields were identified from the 58 data fields created by UMR. *Id.* After the relevant fields were identified, Dr. Kneuper limited the data based on the criteria identified by Professor Killelea, including the diagnosis codes, procedure codes, in-network status, and the amounts charged to the patient. Kneuper Decl. § 2.0. Dr. Kneuper conducted additional analysis by comparing the larger dataset against the claims data for the Plaintiffs, analyzed the results, and reached conclusions about the scope of the data. *Id.* § 2.2. This kind of specialized knowledge provides helpful insight to the Court that it could not gain on its own.

UMR's contention Dr. Kneuper's work could be completed by an "untrained layman" is incorrect.[7] Defs.' Mem. at 27 (quoting *United States v. Clapp*, 46 F.3d 795, 802 (8th Cir. 1995)). To accept UMR's argument would require a fact-finder (here, the Court) to analyze over six million rows of data across nine datasets, apply a set of criteria to multiple fields within the data, offset negative amounts and outliers in the data, eliminate duplicates, and reach conclusions based on that analysis. *See* Kneuper Decl. § 2.0 n.14 ("The data included 58 unique fields associated with each service. In total, there were 6,326,173 unique rows of services in the data associated with 1,143,370 claims and

---

[7] Indeed, despite asserting that any layperson "can filter and add rows in Excel files," Defs.' Mem. at 27, UMR's counsel has resisted producing data based on the supposed impossibility of managing large datasets. *See* Dec. 9, 2024 Hr'g Tr. at 21:20-23 (UMR's counsel objecting to producing claims data on the grounds there is too much data).

710,048 unique patient IDs."); *id.* § 2.1 n. 18 (noting negative claim values in the data and offsetting positive amounts with the corresponding negative amounts). Courts routinely reject such arguments, and this Court should as well. *See, e.g.*, *Sihler v. Global E-Trading, LLC*, No. 8:23-cv-1450, 2025 WL 1425400, at *7 (M.D. Fla. May 16, 2025) (determining expert's opinions and calculations would help the jury where spreadsheet contained "over 414,000 rows" and required "advanced Excel techniques"); *Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*, No. 0:18-cv-63130-RAR, 2020 WL 1666763, at *8 (S.D. Fla. Apr. 3, 2020) ("Although at least some lay people are likely capable of performing the same analysis and calculations, the work undertaken by Sharp is undoubtedly beyond the understanding of the *average* lay person."); *Arnold v. Ambulance Serv. of Bristol, Inc.*, No. 2:06-cv-105, 2007 WL 5117409, at *1 (E.D. Tenn. Aug. 21, 2007) ("[W]hat is a simple mathematical computation to one person may be mind-numbingly complicated to another.")

### 2. UMR's Criticisms of Dr. Kneuper's Analysis Are Not a Basis for Exclusion.

UMR argues that because data *it produced* in this case "appear" to contain claims for non-ERISA plans, Dr. Kneuper's analysis is unreliable. Defs.' Mem. at 28. UMR then points to Plaintiffs' discovery requests and the magistrate judge's order requiring UMR to produce claims data as evidence that it produced claims data for non-ERISA plans. *Id.* At bottom, this argument is a dispute about the factual basis for Dr. Kneuper's conclusions. Those arguments all go to the weight of the evidence, not admissibility and are no basis for exclusion. The Court need not go further.

UMR's argument is also patently disingenuous. Plaintiffs initially requested Explanation of Benefit documents from UMR for all individuals who received PrEP services during the class period and instructed UMR to identify all "UMR Members who had prescriptions filled for PrEP during the Class Period." ECF No. 89-1 at 5 (Plaintiffs' RFP No. 8 seeking information about individuals who received PrEP services); ECF No. 89-2 at 3 (Plaintiffs' interrogatory seeking identities of individuals who received PrEP services). UMR objected because the requests sought information for all UMR Members and refused to produce anything or identify any individuals. ECF No. 89-3 at 12 (Defendant's objections to Plaintiffs RFP No. 8); ECF No. 89-4 at 6-7 (Defendant's objections to Plaintiffs interrogatories). As a compromise, Plaintiffs agreed to accept claims data for certain code combinations to resolve the dispute. ECF No. 89-8 at 4. At no point did UMR indicate it was producing data for non-ERISA plans, and even now, it has not definitively stated whether it did or not. *See* Defs.' Mem. at 28. In short, UMR suggests that it *may* have produced data for plans the parties *agree* are not at issue, and is using its own potential production of irrelevant data to argue that Plaintiffs' expert should be excluded. The Court should reject this gamesmanship.

In any event, there is no dispute that UMR knows the status of the plans for which it processes claims and holds all the information necessary to identify non-ERISA plans and grandfathered plans. Non-ERISA plans and grandfathered plans are required to be identified as such, and UMR, as a claims processor, is obligated to adjudicate claims accordingly consistent with the requirements of the plan. *See* 29 C.F.R. § 2520.102-3(t)

(requiring disclosure of ERISA rights to plan participants); 45 C.F.R. § 147.140(a)(2) (requiring disclosure of grandfathered status).

### 3. Dr. Kneuper's Methodology Is Independent from Professor Killelea's Analysis.

UMR argues that because Professor Killelea's methodology is unsound, so is Dr. Kneuper's because he relies on the codes Professor Killelea identified. The argument can be rejected for two reasons.

First, Dr. Kneuper's methodology is independent from Professor Killelea's because his framework for analyzing UMR's claims data can work with any set of criteria. Dr. Kneuper used the criteria defined by Professor Killelea to calculate the harm and identify individuals with claims using those criteria, but underlying methodology is not dependent on those criteria. As he explained, "if Professor Killelea's criteria are modified or additional information emerges that indicates a revised set of criteria is relevant, [his] methodology can readily be adapted to adjust [his] measure of damages." Kneuper Rebuttal § 3.3; *see* Bjorklund Decl. Ex. 15 ("Kneuper Dep.") 42:11-24 ("Now, obviously my methodology can be easily adjusted . . . if a fact finder ultimately determines a different set of codes, then that would change the number. But my methodology would still apply in the same way."). Even without Professor Killelea's criteria, Dr. Kneuper's analysis is helpful and relevant to show that data exists that will allow a measurement of harm on a class-wide basis. *See* Kneuper Decl. § 1.4.

Second, experts are permitted to rely on the opinions of other experts in their analysis. *See Fair Isaac Corp. v. Fed'l Ins. Co.*, 447 F. Supp. 3d 857, 876 (D. Minn. 2020) (holding that an expert's reliance on certain evidence, including another expert's opinions,

goes to weight, not admissibility); *Polaris Indus. Inc. v. Arctic Cat Inc.*, No. 15-4129, 2019 WL 1614319, at *4 (D. Minn. Apr. 10, 2019) (recognizing as "true" the fact that "experts can rely on the opinion of other experts"); *see also* Wright & Miller, 29 Fed. Prac. & Proc. Evid. § 6274 n.50 (2d ed. Apr. 2023) ("[T]he Advisory Committee clearly contemplated that experts can base opinions on the opinions of others."). Rule 703 expressly permits an expert to base an opinion on facts or data not admitted in evidence. Here, the underlying data relied upon is not in dispute; UMR simply disputes the codes selected by Professor Killelea.

### 4. Dr. Kneuper's Methodology Aligns with Plaintiffs' Theory of Liability.

Once again, UMR attempts to smuggle merits issues into a *Daubert* analysis by contending Dr. Kneuper's opinions must be excluded under *Comcast Corp. v. Berhend*, 569 U.S. 27, 35 (2013). The Court can reject this argument for two distinct reasons.

First, *Comcast* does not apply to a *Daubert* motion. Courts have rejected similar arguments for this reason: "Considering whether to exclude a proposed damages model because it is not connected to a theory of liability on a motion to exclude may be premature. At most, it would be unhelpful to the Court if unconnected." *Taqueria El Primo LLC v. Ill. Farmers Ins.*, 577 F. Supp. 3d 970, 987 (D. Minn. 2021); *see, e.g.*, *Advance Tr. & Life Escrow Servs., LTA v. N. Am. Co. for Life & Health Ins.*, 592 F. Supp. 3d 790, 801 (S.D. Iowa 2022) ("*Comcast* does not help Defendant either because that case did not pertain to *Daubert*."); *In re Smitty's/Cam2 303 Tractor Hydraulic Fluid Mktg.*, MDL No. 2936, 2023 WL 9064801, at *3 (W.D. Mo. Nov. 27, 2023) (holding that *Comcast*-based arguments on a *Daubert* motion are premature and not a basis for exclusion).

Second, even if the Court considers the *Comcast* argument on this motion, Dr. Kneuper's report clearly satisfies that standard because his analysis is tied to the theory of liability. Plaintiffs seeking class certification must show "damages . . . susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35. At the class-certification stage, the "[c]alculations need not be exact," so long as the model is "consistent with its liability case." *Id.* (cleaned up). The damages model in *Comcast* failed this test because it included damages tied to four different antitrust models, but the plaintiffs relied on only one of those theories for liability. *Taqueria El Primo*, 577 F. Supp. 3d at 1002 (analyzing *Comcast*); *see also In re Pork Antitrust Litig.*, 665 F. Supp. 3d at 988 (same).

Kneuper does not make that mistake here: his model is tied directly to plaintiffs' theory of liability. *See Meek v. Kansas City Life Ins.*, 126 F.4th 577, 584 (8th Cir. 2025) (holding court had discretion to certify a class where the plaintiff "provided a way of measuring [damages] 'on a classwide basis,' ensuring that 'common questions of liability' predominated over 'individual damage calculations.'" (quoting *Comcast*, 569 U.S. at 34; 4 Newberg & Rubenstein on Class Actions § 12:4 (6th ed. 2024))); *Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414, 421 (5th Cir. 2023) (observing that "[w]hat matters for class certification is . . . whether [p]laintiffs' damages model can be applied in a uniform manner across the class"). Dr. Kneuper's analysis measures the financial harm to the class based on the amounts paid out of pocket for claims denoted as PrEP Ancillary Services. Kneuper Decl. § 1.4. UMR disputes Professor Killelea's analysis as to what codes count as PrEP Ancillary Services, but that does not mean that Dr. Kneuper's method is not aligned with

the theory of liability or that it cannot be applied class-wide. Disputes over the specific inputs into the model do not render the methodology itself inconsistent with the theory of liability.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny UMR's motion to exclude Professor Amy Killelea's and Dr. Robert Kneuper's expert opinions.


Dated:  November 25, 2025              s/Derek C. Waller
                                       Gregory J. Myers, MN #0287398
                                       David W. Asp, MN #0344850
                                       Derek C. Waller, MN #0401120
                                       Kira Q. Le, MN #0505681
                                       LOCKRIDGE GRINDAL NAUEN PLLP
                                       100 Washington Ave. South, Suite 2200
                                       Minneapolis, MN  55401
                                       Telephone: (612) 339-6900
                                       gjmyers@locklaw.com
                                       dwasp@locklaw.com
                                       dcwaller@locklaw.com
                                       kqle@locklaw.com

                                       **ATTORNEYS FOR PLAINTIFFS**